Argued January 4, affirmed April 24,
petition for rehearing denied May 22, 1979

## DRULARD, et ux, *Appellants,*
## *v.*
## LeTOURNEAU, et ux, *Respondents.*
## (No. TC A76-07-10279, SC 25634)

593 P2d 1118

J. Elliott Busey, Portland, argued the cause and filed the brief for appellants. With him on the brief were Ray D. Sherwood and Gilley, Busey & Porter, Portland.

Marvin Nepom, Portland, argued the cause and filed the brief for respondents. With him on the brief were Ray D. Merry and King and Merry, Portland.

Before Denecke, Chief Justice, and Tongue, Bryson and Linde, Justices.*

TONGUE, J.

---

*Bryson, J., did not participate in this decision.

## TONGUE, J.

This is a suit to enjoin the alleged violation of building restrictions in a platted subdivision in Portland by the construction of a house which impaired the view from plaintiffs' house. Plaintiffs appeal from a decree denying relief. We affirm.

The building restrictions include the following provision:

> "No residential building shall be erected, or permitted to remain on any lot in said addition, having more than one story above the level of the street upon which such building fronts, or exceeding 24 feet above the middle point of the front line of such lot, or having a roof pitch exceeding a rise of 7 inches in a run of 12 inches * * *."

Because this is a suit in equity and one for an injunction which would require a home to be torn down or substantially rebuilt, the facts are of particular importance, including the facts relating to the intended purpose of the building restrictions.

### The Facts.

(1) *Plaintiffs' purchase of two view lots and their subsequent sale of one lot.*

Plaintiff Norman Drulard is a civil engineer. Upon moving to Portland in 1965 he and his wife looked for a "view home." They purchased two lots in South Burlingame with a "panoramic view" to the east and northeast, extending from Mt. Hood to Mt. St. Helens. At that time they were informed of the building restrictions. These restrictions, and their intended purpose, were described by plaintiffs' attorney in a statement to the trial court as follows:

> "The building restrictions, which are very explicit, in great detail, recognize that the main value of this property is view. Therefore, all the lots with building restrictions and everything else had been planned so as to get the best use out of the land for view and,

[161]

also, to maintain it as a high quality, well kept neighborhood."[1]

Plaintiffs' house is built on one lot. In 1973 plaintiffs sold the other lot to a Mr. and Mrs. Alexander, except for a thirteen-foot strip retained by them to "protect" their driveway.

(2) *Defendants' purchase of lot formerly owned by plaintiffs; preparation of plans for proposed house; hearing on application of variance.*

On December 3, 1975, defendants purchased that lot from the Alexanders. Before doing so they filed an application for a variance from zoning code requirements relating to setback lines. With their application defendants were required to submit a complete set of plans for the house which they proposed to build on that lot, showing not only its location on that sloping lot, but the details of its construction, including front, side and back "elevation" views. Those plans showed, among other things, the proposed basement, with daylight windows, and the proposed garage—all below the main living area.

Defendant Dale LeTourneau testified that before purchasing the lot he was aware of the building restrictions and that he met with the plaintiffs and showed them a "picture" from a builders' magazine showing "what we wanted to build," but that plaintiffs "rejected the picture" and "asked us to have a set of plans drawn." Defendants then had a set of plans prepared by a Mr. Rogers, a "building-designer" who was not an architect. Mr. Rogers prepared plans which he believed to be in compliance with the building

---

[1] Plaintiffs' attorney also made the following statement to the trial court:

"And these deed conditions and restrictions were adopted with that view in mind and that is the reason why the details of all of these lots, as to how they were to be built, how they were to appear, has been spelled out with such meticulous effort, is to make sure that all of these properties, as the houses are built, can be built in such a manner as to minimize the loss of view for every house. And that is done primarily by keeping the houses low so that the residents do get their views."

[162]

restrictions. Those were the plans submitted by defendants with their application for a variance. Mr. LeTourneau also testified that prior to the hearing on the variance he took those plans to plaintiffs' home where they examined them. It also appears from the tape record of the hearing on defendants' application for a variance that plaintiff Norman Drulard appeared at that hearing and that he stated, on the record, that he "went over the plans and we have no objections to the proposal," other than to suggest that the garage be set back further.

Plaintiff Norman Drulard testified, however, that although defendants had shown to him a "picture" from a builders' magazine, the house as built by them was not in accordance with that picture of the house. He also denied that defendants showed plans to him prior to the variance hearing or that he examined them at that hearing. He also testified that "the only thing discussed" at that hearing was the location of defendants' proposed house on the lot with reference to the street line. He admitted, however, that he "could not say that no one showed [him] any building plans prior to the time the excavation started for the construction of the LeTourneau house."

(3) *Construction of defendants' house; objections by plaintiffs.*

In January 1976 construction was started. The contractor testified that when they were "staking out" the house and before they started to build Mr. Drulard "came out"; that he showed Mr. Drulard all the plans showing the "elevation" of the house and the "setbacks"; and that he did not recall either approval or objection to the plans by Mr. Drulard, other than that he was concerned about "where it was going to be placed on the lot." The contractor also testified that plaintiffs made no objections during "the framing stage" of the construction; that the first objections by plaintiffs were after the house had been "framed and roofed," and that the basis of their complaint at that

time was that "they didn't like the roof line or the way the roof was framed." Mr. Drulard testified that he was in Florida from March 11 to 23 and that it was not until that stage of the construction that he was aware that the house they were building "was going to be two stories" and was not in accordance with the picture that had been previously shown to them.

A meeting was then held in an attempt to work out "some modification that would be acceptable to everybody." Mr. Rogers, the "building-designer," testified that he then drew "some sketches" and made some changes on the roof and proposed moving the top portion of the roof down "about a foot"; that plaintiff Norman Drulard then said that "everything is agreed, but I would like to have you lower those basement windows," and that the negotiations then broke down. Mr. LeTourneau testified to the same effect. That testimony was not denied by plaintiffs. Indeed, Mrs. Drulard testified that Mr. Rogers "tried hard" and "what he said in court this morning was absolutely true."

After those negotiations "broke down" this suit was filed.

(4) *Conflict of testimony whether house is "one story" house; interference with view.*

Plaintiffs' complaint alleges that defendants' house violated the building restrictions in that

" * * * the building has more than one story above the level of the street upon which it fronts, in that it is not in harmony with existing buildings in the addition, in that it restricts the view of plaintiffs, and in that the design, material and construction of said building is inferior to existing buildings in the addition."

The principal disputed issue of fact at the time of trial was whether the house "has more than one story above the level of the street." There was a direct conflict in the testimony on that issue.

[164]

The front of the lot on which the house is built slopes downward from left to right. The floor of the "daylight basement" (if it is a basement) is excavated "into" the hillside on the left or upper side, with windows above the ground level. The floor of the adjacent garage, on the right or lower side, is not below ground level. Above that "daylight basement" and garage is a "split level" living area.

Plaintiff offered the testimony of a realtor-appraiser, who had not seen the interior of the house, to the effect that it is more than a "one story" house and is a "split entry" or a "tri-level" house. That witness admitted, however, that "the definition of a 'story' would exclude that level between the concrete masonry floor below grade and the next floor up," because "[o]therwise, every house out there would be two stories."

Defendents offered the testimony of the contractor who built the house that the "basement area of the house [is] below the street level" and the house "has only one story above street level." As previously stated, however, the "basement" has windows above the ground level. Mr. Rogers, the "builder-designer," also testified that "in the trade" this house would be "classified" as a "one-story house."

It was conceded, however, that the roof of the house obstructed a portion of the view from plaintiffs' house in that plaintiffs could no longer see Mt. St. Helens to the northeast, although they could still see Mt. Hood to the east.

On the other hand, it was also conceded that the height of defendants' house from the middle point of the front line was twenty-one feet, three inches, and that there would be a greater obstruction to plaintiffs' view by a one-story house with a height of twenty-four feet, as permitted under the building restrictions.

### (5) *Plaintiffs' testimony of damages.*

Plaintiffs' complaint asks, in the event of the refusal of an injunction, that they be awarded damages in the sum of $8,000. To support that request plaintiffs offered the testimony of a realtor-appraiser to the effect that the value of plaintiffs' house "without the obstruction of the house to the north" and "assuming that the house to the north did not exist" was $76,500, but that after its construction the value of plaintiffs' house was $69,000. The realtor-appraiser stated that the reason for this difference in value was that a purchaser "will not pay as much for a house that does not have a view, or has a limited view, as for one that has a panoramic or unlimited view." He also testified that the portion of defendants' house involving the windows in the "basement" "is not pertinent to any obstruction of view * * * or loss of value to the Drulards * * *."

To the contrary, defendants offered as a witness an appraiser who testified that although defendants' house "does restrict a portion of their [plaintiffs'] view," it does not do so "substantially or enough to cause any damage." This appraiser also testified to the effect that when plaintiffs sold the lot to the Alexanders in 1973 "they were restricting some of their view," because a house could then be built on that lot "twenty-four feet high from the center line of the lot," in accord with the building restrictions, so as to result in an even greater obstruction of plaintiffs' view than the obstruction resulting from defendants' house.

For these reasons, defendants' appraiser concluded that the value of plaintiffs' house was $70,000 both "before and after" the construction of defendants' house.

### *The Decision of the Trial Court.*

The trial court did not undertake to decide whether defendants' house had "more than one story above the

level of the street upon which such building fronts," so as to violate that provision of the building restrictions. Instead, the trial court construed the building restrictions as "speak(ing) alternatively or disjunctively," i.e., that a house would comply with those restrictions either if it had no more than one story above the level of the street *or* if it did not "exceed twenty-four feet above the middle point of the front line of such lot."[2]

■  We do not agree with that interpretation of the building restrictions. As we read them, they plainly provide that "*No* residential building shall be erected * * * having more than one story above the level of the street * * *or* exceeding twenty-four feet above the middle point of the front line of such lot * * *." In other words, to comply with these restrictions a house can neither have more than "one story" nor can it exceed twenty-four feet in height.

Defendants' house was less than twenty-four feet in height, but there is a serious question whether it had "more than one story above the level of the street upon which such building fronts."[3] As previously noted, there was a direct conflict of evidence on that question, which was not decided by the trial court.

Even if we should hold, however, in reviewing this record de novo, that defendants' house had "more than one story above the level of the street," it would not necessarily follow that the decision of the trial court must be reversed.

*Plaintiffs are not Entitled to an Injunction.*

Plaintiffs cite cases, including our decisions in *Snashall et ux v. Jewell et ux*, 228 Or 130, 363 P2d 566 (1961) and *Alloway v. Moyer*, 275 Or 397, 550 P2d 1379 (1976) in support of the proposition that "[r]estrictive

---

[2] This provision of the building restrictions (paragraph 4) is set forth at the beginning of this opinion.

[3] Plaintiffs rely upon our decision in *Snashall et ux v. Jewell et ux*, 228 Or 130, 363 P2d 566 (1961) in support of their contention that defendants' house had more than "one story."

covenants and restrictions upon the use of land will be enforced to protect view." Plaintiffs say that "where view was so important to the plaintiffs in their purchase in the addition * * * (compensatory damages) are a poor substitute for injunctive relief."

■ Although some courts have issued injunctions in such cases requiring offending buildings to be either removed or altered so as not to obstruct view,[4] we do not believe injunctive relief would be proper under the facts and circumstances of this case.[5] As this court stated in *Hickman v. Six Dimen. Cust. Homes*, 273 Or 3,94, 898, 543 P2d 1043 (1975):

"* * * Mandatory injunctions are not regarded with judicial favor and are used only with caution and in cases of great necessity. * * * Injunctive relief depends upon broad principles of equity and may, in the discretion of the court, be granted or denied in accordance with the justice and equity of the case. * * * Courts balance the equities between the parties in determining what, if any, relief to give * * *." (Citations omitted)

In considering the equities of this case, it may first be noted that plaintiffs were entitled to have their view protected only to the extent that their view would not be impaired by a building constructed in violation of the building restrictions. In other words, although plaintiffs had an unobstructed panoramic view when they purchased their property, they were at all times subject to the rights of the owners of the adjacent lot to build a one-story house twenty-four feet in height and to the impairment of their view to the extent that it would be impaired by such a house.[6] Defendants'

---

[4] *See, e.g., McDonough v. W.W. Snow Construction Co., Inc.*, 131 Vt 436, 306 A2d 119 (1973).

[5] In both *Snashall et ux v. Jewell et ux, supra*, n. 3, and *Alloway v. Moyer*, 275 Or 397, 550 P2d 1379 (1976) the court did not issue injunctions requiring houses to be removed or altered, but awarded damages as an alternative.

[6] No contention is made by defendants in this case that plaintiffs, as the original owners of both lots, were barred from enforcing the building restriction against defendants, as the purchasers of a lot previously owned by plaintiffs, by reason of the decision by this court in *Erwin v. Bayless*, 272 Or 324, 536 P2d 1242 (1975).

[168]

house was twenty-one feet, three inches in height. Thus, the impairment of plaintiffs' view by defendants' house was less than the impairment resulting from a twenty-four foot one-story house, which defendants had a right to build. *Cf. Hanson v. Salishan Properties, Inc.*, 267 Or 199, 203, 515 P2d 1325 (1973). Further, defendants undertook to build their house in the good faith belief that it was in compliance with the building restrictions. They showed the plans for the house to plaintiffs, regardless of whether plaintiffs examined them carefully. Plaintiffs did not object to the house until it was "framed and roofed." Even at that time defendants were willing to modify the roof of the house so as to satisfy plaintiffs' principal objection, but plaintiffs also objected to other matters, such as the basement windows. Finally, the drastic relief requested by plaintiffs, that of the removal or alteration of defendants' home, would place a great burden on defendants.

Under these facts and circumstances we believe that injunctive relief would not be appropriate even if defendants' house is considered to have more than "one story above the level of the street."

*Plaintiffs' Evidence was Insufficient to Support an Award of Damages.*

As previously stated, plaintiffs' complaint asks, in the event that injunctive relief is refused, for an award of damages in the sum of $8,000. Defendants contend, however, that plaintiffs "have failed in their proof of damages."

Without deciding whether defendants have in fact violated the building restrictions, but assuming that they did so, we believe that the proper measure of damages in such a case would be the difference between the value of plaintiffs' property with the nonconforming structure on defendants' lot (defendants' house, as built), and the value of plaintiffs' property with a structure that *conformed* to the restrictions on defendants' lot.

[169]

This view of the proper measure of damages is in accord with this court's ruling in *Frankland v. City of Lake Oswego*, 267 Or 452, 479-80, 517 P2d 1042 (1973), wherein the court stated:

"The plaintiffs herein introduced evidence relating to depreciation in the market value of their property, resulting from the construction of the apartment building. If property damages are to be awarded to plaintiffs, *the damages should be measured by the depreciation in the value of plaintiffs' property which is attributable to the defendants' noncompliance with the final plan.* The City could, pursuant to its police powers and after complying with proper procedures, act in the public interest to zone an area, resulting in the diminution of the value of property within or without the zoned area. In such a case, any damage to a landowner need not be compensated. *Euclid v. Ambler Realty Co.*, 272 US 365, 47 S Ct 114, 71 L Ed 303 (1926). Thus, in the instant case, the City did approve the submitted plans for an apartment building adjacent to plaintiffs' property. However, as we have stated, the building actually constructed bore no relationship to the plans submitted. As a result, the ordinance was violated."

"* * * * *

"* * * Consequently, *plaintiffs are not entitled to a recovery of the full depreciation of their property caused by the construction of the Christensen apartment, but only to such depreciation that resulted from the difference between the apartment constructed and the apartment represented in the sketches which had been approved by the City.*" (Emphasis added)

In *Frankland*, the court quoted with approval from *Thompson v. Smith*, 119 Vt 488, 129 A2d 638 (1957). In *Thompson,* the Supreme Court of Vermont stated (at 653):

"The defendants had legal authority to construct their motel a distance of twenty-five feet from the plaintiffs' west line. The plaintiffs do not contend they are entitled to have the corner lot entirely vacated, nor are they entitled to damages which

[170]

might arise from that part of the occupation of the building site which was lawful. *The plaintiffs are not entitled to a recovery of the full depreciation caused by the construction of the motel on the lot adjoining, but only to such depreciation that resulted from the construction at an unauthorized proximity to the plaintiffs' property and beyond the limit prescribed by the ordinance.* "(Emphasis added)

*See also Donaldson v. White*, 261 Or 314, 493 P2d 1380 (1972), where this court, on the issue of damages and in a case quite similar to this one, compared the value of plaintiffs' property with defendants' house as built to its value if defendants' house had been built to conform with the applicable building restriction.

The only evidence offered by plaintiffs in support of their claim of damages was the testimony of a realtor-appraiser who expressed the opinion that after the construction of defendants' house the plaintiffs' house was worth $69,000 and that it would have been worth $76,500 "without the obstruction of" defendants' house, that is "assuming that the house to the north [defendants' house] did not exist." As previously noted, this witness gave as the reason for this difference in value the fact that the previous "panoramic or unlimited" view plaintiffs had enjoyed when defendants' lot had been vacant had been "restricted" to a "limited view" by the construction of defendants' house.

This estimate of damages, however, is based on a comparison which does not reflect the proper measure of damages, as discussed above. The witness' conclusion that plaintiffs had been damaged in the sum of $7,500 is not based on a comparison between the value of plaintiffs' property with a nonconforming structure on defendants' lot (defendants' house, as built) and its value with a structure on defendants' lot that *conformed* to the restrictions. The $7,500 figure instead is based on an inappropriate comparison between the value of plaintiffs' property with a nonconforming structure on defendants' lot (defendants' house, as

[171]

built) and its value with no structure on defendants' lot.[7]

▪ In other words, we do not mean to say that plaintiffs would not be entitled to damages resulting from the obstruction of their view as a result of the construction on the adjacent lot of a house of more than one story, but less than twenty-four feet in height. In such a case, however, the measure of damages would be the difference in value of plaintiffs' house with its view obstructed by such a house as compared with its value in the event that a one-story house less than twenty-four feet in height were built on the adjacent lot (as permitted by the building restrictions), not as compared with its value with *no* house built on the adjacent lot. Plaintiffs offered no evidence of damages measured by this proper standard and, therefore, failed to carry their burden of proof of damages.

It follows that although we do not agree with the reasons why the trial court entered a decree denying both an injunction and damages to the plaintiffs, we agree that the entry of such a decree was proper and that it should be and is affirmed.[8]

---

[7] It is worth noting in this regard that plaintiff Norman Drulard conceded in his testimony that even a one-story house "would have interfered some" with plaintiffs' view.

[8] *See State Farm Fire v. Sevier*, 272 Or 278, 298, 537 P2d 88 (1975).