NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS

## DIVISION ONE

PINNACLE PEAK RANCHOS
PROPERTY OWNERS ASSOCIATION, an Arizona
non-profit corporation, *Plaintiff/Appellee*,

*v.*

FREDERIC RAMIOULLE and NATALIE
RAMIOULLE, husband and wife, *Defendants/Appellants.*

No. 1 CA-CV 14-0409
FILED 12-10-2015

Appeal from the Superior Court in Maricopa County
No. CV2013-052659
The Honorable Michael D. Gordon, Judge

**AFFIRMED**

COUNSEL

Davidson & Kaffer, PLLC, Scottsdale
By Frederick E. Davidson, Chad R. Kaffer
*Counsel for Plaintiff/Appellee*

Udall Shumway, PLC, Mesa
By Joel E. Sannes
*Counsel for Defendant/Appellant*

## MEMORANDUM DECISION

Presiding Judge Diane M. Johnsen delivered the decision of the Court, in which Judge John C. Gemmill and Judge Peter B. Swann joined.

J O H N S E N, Judge:

¶1          Frederic and Natalie Ramioulle appeal from the judgment granting a permanent injunction against them in favor of Pinnacle Peak Ranchos Property Owners Association (the "Association").  For the following reasons, we affirm.

### FACTS AND PROCEDURAL BACKGROUND

¶2          In 2010, the Ramioulles purchased a lot in Pinnacle Peak Ranchos subdivision.  Their lot was subject to deed restrictions specified in the Restated and Amended Declaration of Covenants, Conditions and Restrictions for Pinnacle Peak Ranchos ("CCRs").  Under section 2.8 of the CCRs, "[n]o structure located on the Property shall exceed one story in height (exclusive of basement)."  The CCRs also state that "[n]o construction . . . shall be commenced . . . without the prior written approval of . . . (the 'Architectural Review Committee.')".

¶3          Before beginning construction of their home, the Ramioulles submitted their design plans to the Architectural Review Committee (the "ARC").  The plans included an interior staircase and an interior "bridge" at the same elevation as an exterior roof deck.  The ARC rejected the plans because it found that the "bridge" constituted a "second story element" that violated section 2.8.  In a subsequent plan, the Ramioulles kept the exterior roof deck at the same elevation but moved the staircase to the exterior of the home and removed the offending bridge, creating in its place a tall open area labeled "clerestory area."  The ARC approved the new design.

¶4          The home the Ramioulles proceeded to build, however, deviated from the approved plans.  Instead of retaining the "clerestory area" as an open expanse, the Ramioulles created a new second-story room, approximately seven feet in height, in the previously designated clerestory area.  After the ARC learned of the deviation a year later, it inspected the home, then asked the Ramioulles to remove the floor that had not been in the approved plans.  After the Ramioulles refused and subsequent

negotiations failed, the Association filed suit in superior court, seeking an injunction requiring the Ramioulles to cease construction in violation of the approved plans.

¶5        The superior court granted the Association's request for a temporary restraining order.  During the preliminary injunction hearing that followed, the parties agreed to consolidate preliminary and permanent injunctive proceedings.  Following three days of trial, the superior court granted judgment in favor of the Association and ordered the Ramioulles to remove the second floor, thereby bringing their project into compliance with the January 2012 plans.

¶6        The Ramioulles timely appealed.  We have jurisdiction pursuant to Arizona Revised Statutes ("A.R.S.") section 12-2101(A)(1) (2015).[1]

## DISCUSSION

¶7        The Ramioulles argue the superior court erred in interpreting section 2.8 of the CCRs.  Restrictive covenants are a contract between the subdivision's property owners as a whole and the individual lot owners. *Ahwatukee Custom Estates Mgmt. Ass'n, Inc. v. Turner*, 196 Ariz. 631, 634, ¶ 5 (App. 2000).  Because contract interpretation presents questions of law, we interpret restrictive covenants *de novo.  See id.*

¶8        In *Powell v. Washburn*, 211 Ariz. 553, 554, ¶ 1, 556-57, ¶ 13 (2006), the Arizona Supreme Court adopted the Restatement (Third) of Property approach for interpreting restrictive covenants, which requires giving "effect to the intention of the parties ascertained from the language used in the instrument, or the circumstances surrounding creation of the servitude, and to carry out the purpose for which it was created."  *See* Restatement (Third) of Prop.:  Servitudes § 4.1(1) (2000).

¶9        Section 2.8 of the CCRs states, "No structure located on the Property shall exceed one story in height (exclusive of basement)."  The Ramioulles argue the phrase "one story in height" denotes a height limitation, not a limit on the number of stories a structure may have; the Association argues section 2.8 bars any home of more than one story (exclusive of basement).

---

[1]        Absent material revision after the relevant date, we cite a statute's current version.

**¶10**          Looking first to the text of the provision, words in a restrictive covenant "must be given their ordinary meaning, and the use of the words within a restrictive covenant gives strong evidence of the intended meaning." *Burke v. Voicestream Wireless Corp. II*, 207 Ariz. 393, 396, ¶ 13 (App. 2004).[2]

**¶11**          Use of the term "one story" in section 2.8 is strong evidence that the drafter intended the restriction to limit the number of stories in a home.  In determining the ordinary meaning of words, we rely on dictionary definitions.  *See Horton v. Mitchell*, 200 Ariz. 523, 527, ¶¶ 17-18 (App. 2001) (citing dictionary definition of "structure" in interpreting a restrictive covenant); *Tucson-North Town Home Apartments Homeowners' Ass'n v. Robb*, 123 Ariz. 4, 6 (App. 1979).  The dictionary defines "story" as "a section or horizontal division of a building extending from the floor to the ceiling or roof lying directly above it."  Webster's Dictionary 1796 (2d ed. 1983).  It defines height as "the distance from the bottom to the top." *Id.* at 841.  Accordingly, applying the ordinary meaning of the words to the provision, section 2.8 restricts the height of a building to one story, exclusive of basement.

---

2      *Powell* declined to follow the principle recited in *Burke* and other cases that when language in a restrictive covenant is ambiguous, a court should construe the language strictly in favor of free use of land.  211 Ariz. at 557, ¶¶ 14-15.  Under Restatement § 4.1 and *Powell*, "the expressed intention of the parties is of primary importance.  Their intention is ascertained from the servitude's language interpreted in light of all the circumstances.  Relevant circumstances include the location and character of the properties burdened and benefited by the servitude, the use made of the properties before and after creation of the servitude, the character of the surrounding area, the existence and contours of any general plan of development for the area, and the consideration paid for the servitude." Restatement (Third) of Prop.:  Servitudes § 4.1, cmt. d.  Arizona courts therefore no longer default to a free-use construction upon discovery of an ambiguity.  Instead, we apply traditional methods of contract interpretation to determine and enforce the actual intent of the restriction.  We note, however, that Restatement § 4.9 provides:  "Except as limited by the terms of the servitude determined under § 4.1, the holder of the servient estate is entitled to make any use of the servient estate that does not unreasonably interfere with enjoyment of the servitude."  Accordingly, while we discern an intent contrary to the Ramioulles' proposed use in this case, we recognize the continuing vitality of the rule that free use of land is permitted absent an agreement to the contrary.

¶12 The Ramioulles argue that the subheading of section 2.8, "Height Limitation," along with the phrase "in height," mean that the provision is intended to be a height limit. But they offered no evidence at trial and no argument on appeal that would give any objective meaning to that purported construction. In other words, accepting the Ramioulles' argument that section 2.8 sets out a "height limitation" for structures in the subdivision, the CCRs contain no articulable height limit at all (in terms of inches and feet) *other than that a structure may be no more than one story*. The provision's use of "story" as a term that defines a structure's permitted height is reinforced by the provision's reference to "basement." In specifying that a basement is not a "story" for purposes of the height limitation, section 2.8 makes clear that the relevant term of height measurement is a "story" (exclusive of a basement).

¶13 The Ramioulles contend that in interpreting section 2.8, *Powell* requires us to look to the developer's intent in 1959, when the covenants were first created and recorded. As the Association correctly points out, however, the CCRs were substantially revised in 1989 before the Ramioulles purchased their lot. In the end, the distinction makes no difference because neither side offers any writings or statements contemporaneous to either time period that are particularly relevant to our inquiry. The current CCRs' stated purpose is "for enhancing and perfecting the value, desirability and attractiveness of the Property." We are unable to conclude that broad language gives greater support to either side's interpretation of the provision at issue.

¶14 The Ramioulles, however, contend the purpose of section 2.8 is to protect views in the community. They note that the elevation (height) of the home they are building does not exceed the height specified in the set of plans the ARC approved, and argue that, as built, their home does not impermissibly obstruct their neighbors' views. The Association responds that the purpose of section 2.8 is to protect the privacy of owners in the community, not (or not solely) to protect their views. The Association argues that even though the addition of what the ARC concluded was a second story did not change the height of the Ramioulles' home, the change would allow the Ramioulles to look out through the second-floor windows upon nearby yards without their neighbors' knowledge. The Association concedes that under the approved plans, the Ramioulles could look out on their neighbors from the approved elevated open deck, but points out that neighbors will know when they are in plain view of persons on the deck but will not know when they are being observed by persons looking through the second-story windows.

¶15    Although section 2.8 may both promote homeowners' views and protect their privacy, neither the Ramioulles nor the Association offers any real evidence for the proposition that the original grantor or the members of the association who revised the CCRs in 1989 intended that the provision be construed to promote either principle over the other.

¶16    Construction patterns in the subdivision, however, support the conclusion that, over time, parties to the CCRs have understood that no home in the subdivision may have more than one story.  The ARC chairperson testified that since 1959, no two-story homes have been allowed in the community, and the superior court found that the ARC has never approved a two-story home.[3]  We therefore infer from the language of the provision and from the circumstances surrounding the creation of both versions of the CCRs that the parties intended section 2.8 to restrict homes to only one story.  *See* Restatement (Third) of Prop.:  Servitudes § 4.1 cmt. d.

¶17    The Ramioulles argue case law supports their contention that section 2.8 does not prevent construction of a two-story home.  But in each of the cases they cite, by contrast to this situation, the court had direct evidence supporting a party's proffered interpretation of the restriction.  *See Jones v. Brown*, 748 P.2d 747, 748, n.1 (Alaska 1988) (homes could be only "one story or split-level in design and of a height no more than is usual for houses of similar design"; witnesses testified home was no taller than a typical split-level house); *Smith v. North*, 53 Cal. Rptr. 94, 95 (App. 1966) (covenants specified giving "special import to the view angle"); *Drulard v. LeTourneau*, 593 P.2d 1118, 1123 (Or. 1979) (home complied with overall 24-foot height limit); *Foster v. Nehls*, 551 P.2d 768, 771 (Wash. App. 1976)

---

[3]    The Ramioulles argue that two homes in the subdivision exceed one story in height.  The ARC chairperson, however, testified the ARC approved plans for one of the homes after concluding its bottom floor, which was below grade, was a basement, not a first story.  As for the second home, the ARC chairperson testified that there was no dispute regarding the height of the home.  While the initial design of the home contained a split-level, the lot owners removed the split-level, eliminating the ARC's concern that the house would exceed one story.  As noted, based on the evidence at trial, the superior court found that the ARC has never approved the building of a two-story home.

(original developer testified parties did not intend to reduce height restriction to "inches and feet" but to protect views).[4]

¶18   Given the plain language of section 2.8, which seems to measure a height limitation in terms of a "story," and the fact that the ARC has never approved a home exceeding one story in height, we conclude that a home exceeding one story (exclusive of basement) violates the restriction. The superior court found that the feature the Ramioulles were building in what their plans had shown as an open clerestory constituted a habitable story. In support of its finding, the court noted that it had "vents for air-conditioning . . . wiring installed for internet and TV hookup," and in plans and correspondence by the Ramioulles, the area was referred to as "Mr. Ramioulle's office." Substantial evidence supports the superior court's finding that the space in question constituted a story in violation of section 2.8 of the CCRs.

¶19   The Ramioulles also argue, however, that under section 7.1 of the CCRs, the ARC lacks the power to review a feature (here, the second floor) that is not visible from the neighboring property. Section 7.1 states:

> 7.1 <u>Obligation to Submit Exterior Plans for Approval</u>. No construction, landscaping, painting, installation or refurbishment of any Improvement (including without limitation, buildings, fences, walls, windows, storage facilities, landscaping, excavation, grading, entryways, vestibules, stairways, awnings, patio covers, window coverings or treatments, antennas, balconies or patios) shall be commenced, erected or maintained upon the Property or any portion of a Lot, visible from neighboring property without the prior written approval of a committee (the "Architectural Review Committee"). . . .

The Ramioulles argue that applying the rule of *ejusdem generis* to section 7.1 leads to the conclusion the ARC's review is limited to the exterior of the home.

---

[4]  The Ramioulles also cite *Hiner v. Hoffman*, 977 P.2d 878 (Haw. 1999), but that case is not relevant. The parties there agreed that a restriction of not more than "two stories" was intended to limit the height of homes, but the court held the limit was too ambiguous to be enforceable because it did not establish a measureable height limit. *Hiner*, 977 P.2d at 885. The Ramioulles do not argue that section 2.8 is too ambiguous to have meaning.

¶20          We disagree.  Under the rule of *ejusdem generis*, the meaning of a term is presumed to be limited to "the enumerated specific terms and to include only those things of the same nature as those specifically enumerated unless a clear manifestation of a contrary intent is apparent." *United Cal. Bank v. Prudential Ins. Co. of Am.*, 140 Ariz. 238, 273 (App. 1983). Here, it is clear from the CCRs as a whole that the ARC's authority extends beyond approval of the exterior of a home.  Under section 7.3, lot owners must submit plans to the ARC allowing the committee to "understand the nature, kind, size, areas, height . . . of the proposed . . . structure."  Whether a proposed design has more than one story is an inquiry into the "nature [and] kind" of the home.  Additionally, the ARC's authority under section 7.4 includes withholding approval of proposed construction if it "is not suitable or desirable . . . taking into consideration the requirements of this Declaration."

¶21          Reading these provisions together, we conclude section 7.1 does not preclude the ARC from inspecting interior elements of a building design when it must do so to ensure compliance with the CCRs.  Because the CCRs contain a one-story restriction, the ARC must be able to determine whether a home complies with that restriction.  Accordingly, its approval authority extends to the interior of a home as necessary to make that determination.

¶22          At oral argument before this court, counsel for the Ramioulles argued that the ARC's jurisdiction stops at the exterior window treatments. But a window is both an exterior and an interior feature of a home.  Thus, the inclusion of "windows" in section 7.1 suggests that the ARC's authority extends to some degree within the interior of a home.  Additionally, the record shows that the Ramioulles and the ARC reached a compromise by which the windows in the clerestory area would be relocated and reduced in size.   That agreement fell apart, Mr. Ramioulle testified, because structural issues prevented the windows from being raised to the stipulated level.

¶23          Finally, the Association argues the Ramioulles deviated from the approved plans not only by including a second story but also by deleting parapet walls, including external second-story doors, and exterior cable fencing.  It asks us to construe the superior court's injunction to require the Ramioulles not only to remove the second-story floor, but also to remedy any other variation from the approved plans.  In response, the Ramioulles argue the second-story floor was the only alleged deviation tried to the court, and argue the injunction is not broad enough to encompass any issue other than the second story.

**¶24** The record reveals that the focus at trial was on whether the Ramioulles' home violated the story limitation of section 2.8. Although the superior court found the second story violated the CCRs, its judgment stated, "The only adequate remedy under the circumstances is to order Defendants to remove the second story floor and bring the project into compliance with the Approved Plans or in any other manner that is approved by the ARC." Because the superior court is in the best position to address the scope of its injunction, we will not modify or address the extent of judgment. To the extent the scope of the injunction is not clear, the parties may take up that issue with the superior court.

**¶25** In our discretion, we deny both parties' requests for attorney's fees. The Association may recover its costs upon compliance with Arizona Rule of Civil Appellate Procedure 21(b).

## CONCLUSION

**¶26** We affirm the judgment.



Ruth A. Willingham · Clerk of the Court
FILED: ama