Argued September 6, reversed November 23, 1973

HANSON ET AL, *Respondents, v.* SALISHAN PROPERTIES, INC., ET AL, *Appellants.*

515 P2d 1325

*Cleveland C. Cory,* Portland, argued the cause for appellants. With him on the briefs were Clarence R. Wicks, and Davies, Biggs, Strayer, Stoel & Boley, attorneys for appellants Salishan Properties, Inc., and

Messrs. Colwell, Gray, Mikkelson, Pugh, Schwarz and Scrogin; and Dean D. DeChaine, and Miller, Anderson, Nash, Yerke & Wiener, Portland, attorneys for appellant Michael P. Lockwood.

*James H. Clarke,* Portland, argued the cause for respondents. With him on the brief were James C. Dezendorf, Craig E. Iverson, Richard H. Williams, and Dezendorf, Spears, Lubersky & Campbell, Portland.

Before O'CONNELL, Chief Justice, and HOLMAN, TONGUE, HOWELL, and BRYSON, Justices.

HOLMAN, J.

This is a suit for a permanent injunction prohibiting defendant Lockwood from building a specific kind of house on his leased Salishan beach-front lot. The proceeding was brought by three upland leaseholders who alleged that the proposed home unreasonably interfered with their view of the beach and of the Pacific Ocean. Salishan Properties, Inc., the common lessor, and the members of its Architectural Committee were joined as defendants on the ground that a majority of the committee had unlawfully sanctioned and permitted Lockwood to commence the construction of a two-story house.

Plaintiffs contend this permission violated certain lease covenants common to all lessees as well as policies set forth in a "checklist" of "Architectural Considerations" which was mentioned in the lease and which had been circulated by Salishan Properties, Inc., to prospective lessees, including plaintiffs. The above-named defendants appealed from a decree preventing defendant Lockwood from building a house of more

than one story. All defendants other than those mentioned above were dismissed.

All leases from Salishan Properties, Inc., provided for the formation of an Architectural Committee and contained the following relevant provisions:

"\* \* \* \* \*.

"Salishan, Inc. is willing to lease to Lessees on a long-term basis a homesite in Salishan, provided that Lessees will agree to certain conditions and restrictions on the use of such site designed to protect Salishan and other Salishan tenants.

"Lessees wish to lease a homesite. LESSEES UNDERSTAND THAT THEIR RIGHT TO USE THE HOMESITE WILL BE SUBJECT TO THE COVENANTS, RESTRICTIONS, AND CONDITIONS HEREIN SET FORTH AND THAT THE SAME WILL BE STRICTLY ENFORCED.

"\* \* \* \* \*.

"Section 30. Approval of plans by architectural committee.

"30.1 Salishan, Inc. recognizes that there can be an infinite number of artistic conceptions and ideas for the development of homesites consistent with its plan for Salishan. Salishan, Inc. wishes to encourage the formulation of such conceptions and ideas. Nevertheless, for the protection of all Salishan tenants, Salishan, Inc. wishes through the architectural committee, to make certain that any development of a homesite will be consistent with its plan for Salishan. The architectural committee has prepared an architectural checklist setting forth general concepts for the development of Salishan which is available at the office of Salishan, Inc. Such checklist may be modified from time to time.

"\* \* \* \* \*.

"Section 33. View.

"It is important that Lessees shall restrict the height of improvements on the leased premises and the height of trees and vegetation growing thereon to the end that the view of other Salishan tenants shall be preserved to the greatest extent reasonably possible. Limitation as to the height of improvements will be accomplished through the provisions contained in Section 30 * * *.

"* * * * * *"

The "checklist" of "Architectural Considerations" mentioned in the lease which was distributed to all purchasers contained the following:

"A. ARCHITECTURAL CONSIDERATIONS:

"1. In general, all homes will be single story, except on sites which lend themselves to daylight basements, or split levels. Views from all lots will be safeguarded to the extent reasonably possible.

"* * * * *.

"7. The orientation and location of houses on lots is to be reviewed by the Architectural Committee. The intent is to keep all homes as compatible as possible with their natural surroundings and with each other. We require submission of preliminary plans for approval before you proceed with final plans.

"* * * * *.

"8. * * * The important thing will be the compatibility of the home to its site and to its neighbors. Care is to be taken that the site is not overbuilt * * *."

The question posed is whether the provisions of the lease and the "Architectural Considerations" which we consider to be incorporated in the terms of the lease

prohibit the approval and construction of the Lockwood house under the existing circumstances.

The Lockwood house will contain a main floor of 1,228 square feet and a loft or second story which has 300 square feet of space over seven feet in height. The roof line on most of the house will be 19 feet in height from the finished grade and, on one eight-foot section, will be 21 feet 4 inches above such grade. There is much testimony in the record as to what constitutes a one-story, one-and-one-half-story, and two-story house. While there is no agreement on the meaning of these terms, it can safely be said that the contemplated home of the Lockwoods (however it may be correctly described) is more than one story. The evidence also indicates that the average height of a pitched-roof, one-story house is about 16 feet. It also is apparent from the photographic exhibits that almost all, if not all, of plaintiffs' view of the beach and ocean above the Lockwood house would be obstructed even if it was limited to one story. Any further impairment of view by addition to its height would be minimal.

There are general provisions concerning the importance of the height, the most definite being the provision that

"* * * Lessees shall restrict the height of improvements * * * to the end that the view of other Salishan tenants shall be preserved to the greatest extent reasonably possible. Limitations as to the height of improvements will be accomplished through the provisions contained in Section 30."

In Section 30 is the reference to the checklist. In the checklist is the only mention of the number of stories which a house may possess. It provides:

"In general, all houses will be single story, except on sites which lend themselves to daylight base-

ments or split levels. Views from all lots will be safeguarded to the extent reasonably possible."

The site of the house in question is not one which particularly lends itself to a daylight basement or a split level house.

The provisions are noticeably free from absolutes. "In general" all houses will be a single story. "Generally" is defined by Webster's Third International Dictionary (1963 ed) as "in disregard of specific instances and with regard to an over-all picture," and "as a rule." Such a provision leads to the conclusion that on a reasonably level lot where others' views are affected, more than one story will be the exception, but is not absolutely prohibited.

The more serious restriction is that height will be limited to the end that views "shall be preserved to the greatest extent reasonably possible." The sort of a structure which will so preserve the view is, of course, a matter of opinion. The documents in question leave such a decision to the Architectural Committee. The committee was of the opinion that a few feet of additional height to the Lockwood house would obstruct less view of consequence than would be the case if the usable square footage in the second story were added to the first floor, thereby creating additional width. Defendant Lockwood had not built out to the setback lines at the sides of his lot. Unless this court can find that the decision of the Architectural Committee *did not* preserve the view of upland owners to the greatest extent reasonably possible, that committee's decision should not be disturbed. From the evidence in this case we cannot say with any conviction that its decision did not so preserve plaintiffs' view.

The opinion of the trial court is reversed and plaintiffs' complaint is dismissed.