Argued and submitted July 16, 1993, reversed and remanded on appeal; affirmed on
cross-appeal October 26, 1994

## John G. VALENTI
and Margaret M. Valenti,
*Appellants - Cross-Respondents,*

*v.*

## Benjamin T. HOPKINS
and Susan Hopkins,
*Respondents - Cross-Appellants.*

(90CV-0323-TM; CA A74166)

883 P2d 882

James E. Mountain, Jr., argued the cause for appellants -
cross-respondents. With him on the reply brief were Milo R.

Mecham and Harrang Long Watkinson Laird & Rubenstein, P.C. On the opening brief was James W. Walton.

Barry L. Adamson argued the cause for respondents - cross-appellants. With him on the briefs was Michael W. Peterkin.

Before Rossman, Presiding Judge, and Landau and Leeson, Judges.

LANDAU, J.

## LANDAU, J.

This is an action to enforce restrictive covenants in a residential subdivision. Plaintiffs appeal from the trial court's denial of their request for injunctive relief requiring defendants to move or modify their house so as not to obstruct plaintiffs' view of the mountains. Defendants cross-assign error to the trial court's failure to dismiss plaintiffs' action. They also cross-appeal, contending that the award of attorney fees is inadequate.

In 1988, plaintiffs purchased their two-story home in the West Ridge Subdivision in Deschutes County. Located on a ridge, the subdivision lots have views of the Cascade mountains to the west and the Paulina and Ochoco mountains to the east. Plaintiffs' lot is on the east side of West Ridge Avenue. At the time they purchased their house, there were restrictive covenants applicable to the subdivision. One of those covenants prohibited the construction of improvements that materially restricted the view of "other lot owners." Plaintiffs had an unimpeded view in all directions.

In 1989, the subdivision lot owners adopted "amended covenants" that controlled, among other things, the design of newly constructed homes. Article I of the amended covenants provides for the creation of an "Architectural Control Committee" (the committee):

"(A) An Architectural Control Committee is hereby established. This Committee shall consist of three (3) lot owners with the selection being made by an annual vote of all then [sic] lot owners to be held on or about May 1st of each year, with each lot owner entitled to one vote regardless of the number of lots owned. * * *

"(B) Generally, the Committee will be responsible for approval of plans and specifications of private areas and for promulgation and enforcement of its rules and regulations governing the use and maintenance of private areas and improvements thereon.

"* * * * *

"(D) Neither the Architectural Control Committee nor any member thereof shall be liable to any lot owner for any damages, loss or prejudice suffered or claimed, on account of any action or failure to act of the Committee, or a member thereof, provided only that the member, in accordance with

actual knowledge possessed by him/her, has acted in good faith.

"Section 2.  Architectural Control Committee Consent.

"Consent of the Architectural Control Committee is required for all new construction, exterior remodel, landscaping, and any major improvements upon the lot. In all cases, the following provisions shall apply:

"(A)  Materials Required to be Submitted.

"* * * * *

"When construction is approved, the Architectural Control Committee will stamp 'APPROVED' on one set of plans and retain the second set. There will be no alteration in plans or construction without Architectural Control Committee approval.

"(B)  Architectural Control Committee Discretion and Guidelines.

"The Architectural Control Committee may at its discretion withhold consent with respect to any proposal which the Committee finds would be inappropriate for the particular lot or would be incompatible with the neighboring homes and terrain within West Ridge Subdivision. *Considerations such as size, height, color, design, view, effect on other lots, disturbance of existing terrain and vegetation, and any other factor which the Committee reasonably believes to be relevant, may be taken into account by the Committee in determining whether or not to consent to any proposal.*" (Emphasis supplied.)

Article II of the amended covenants lists restrictions on use of property, and includes provisions regarding maintenance of lots, types of residences, temporary structures, appearance, commercial or offensive activities, animals, motorized vehicles, parking, firearms, sale of subdivision sections, and compliance with laws and regulations regarding fire protection, construction, water sanitation and public health.

Article III of the amended covenants states architectural rules. Section 4 deals with the subject of view and building height:

*"The height of improvements or vegetation and trees on a lot shall not materially obstruct the view of adjacent lot owners.* The Architectural Control Committee shall judge

the suitability of such heights and may impose restrictions. If the Architectural Control Committee determines there is such obstruction of view of adjacent lot owners, written notice shall be delivered to the offending owner. If, after 30 days the improvement, vegetation or trees are not removed or reduced in height, as approved by the Architectural Control Committee, the Committee shall arrange to have the removal or reduction completed, charging the owner of the lot the reasonable costs for work done. * * *" (Emphasis supplied.)

Article IV contains "general provisions," among them Section 2, which provides, in part:

"Enforcement shall be by proceedings at law or in equity against any person or persons violating or attempting to violate any Covenants either to restrain violation or to recover damages and may be brought by any owner in the subdivision. In the event that suit or action is initiated, the prevailing party shall be entitled to recover all costs and reasonable attorney's fees incurred in such action."

In early 1990, defendants purchased the lot immediately to the west of and across the street from plaintiffs' home. In March, 1990, they submitted to the committee their house design proposal, which called for the construction of a two-story log home. Plaintiffs were aware of the design and objected to it on the ground that it would block their view of the Three Sisters and Broken Top mountains. A member of the committee visited with plaintiffs to discuss defendants' proposal. Plaintiffs understood that their view from the first floor would be blocked by any house built on defendants' lot; they expected the committee to protect the view from their second floor.

The committee rejected defendants' design proposal, but for reasons not relating to view. In April, 1990, defendants submitted a second proposal. Again, the design called for the construction of a two-story log home. The committee approved the proposal without imposing a height restriction. Defendants later decided that they would rather build a "stick-frame" house of the same basic design. The committee approved defendants' revised plans in August, 1990.

In its consideration of defendants' house design, the committee discussed and examined various approaches that

might have diminished the house's impact on plaintiffs' westerly view. The committee expressly considered the options of placing a restriction on the height of defendants' house, of requiring them to locate the house on a different part of the lot, of requiring them to excavate the lot, or of creating staggered set backs. Each option was rejected based on perceived countervailing considerations. The committee expressly declined to withhold its consent to the design on the ground that the proposed design materially obstructed plaintiffs' view. It reasoned that plaintiffs' view was intended to be to the east, and that plaintiffs had no protected western view. The committee advised plaintiffs that their western view could be enjoyed while it was there, but that it was not subject to protection. Because it concluded that plaintiffs had no protected western view from the front of their home, the committee did not consider it significant that defendants' house materially obstructed their western view.

After the committee's decision, defendants began construction of their home. Within a week, plaintiffs filed this lawsuit, seeking injunctive relief and specific performance of the covenants. Defendants completed the construction of their home during the pendency of this lawsuit. The trial court found for defendants, concluding that the committee had not acted unreasonably in approving defendants' plans.

On appeal, plaintiffs argue that the trial court erred in failing to conclude that defendants breached the restrictive covenants that prohibit the erection of structures that materially obstruct the view from an adjacent lot. Defendants argue that the trial court reached the correct conclusion. In their cross-assignment, defendants argue that the trial court should not even have allowed the case to go to trial. According to defendants, plaintiffs' claim is legally defective because it is not directed against the committee itself as a challenge to the reasonableness of its decision.

■ We first dispose of defendants' argument on its cross-assignment. The restrictive covenants provide that their enforcement

> "shall be by proceedings at law or in equity against any person or persons violating or attempting to violate any Covenants either to restrain violation or to recover damages and may be brought by any owner in the subdivision."

The property owners, not the committee members, are the parties to the covenants, and they are the "persons" against whom the covenants may be enforced "by proceedings at law or in equity." The amended covenants provide, in fact, that the committee shall not be liable to any lot owner for any loss suffered on account of a good faith act or failure to act of the committee. That further indicates the intention of the parties that claims for damages based on a failure of the committee to act in accordance with the covenants are to be directed against the individual land owner rather than the committee itself. We conclude that plaintiffs' claim need not have been brought as a direct challenge to the committee's decision or against the committee directly. Under the terms of the covenants, plaintiffs were entitled to sue defendants for their alleged violation of the terms of the covenants.

We turn to the appeal. In holding that the committee's decision was enforceable, the trial court relied on the general contract law principle stated in *Lincoln Const. v. Thomas J. Parker & Assoc.*, 289 Or 687, 692, 617 P2d 606 (1980), that when a contract assigns to a third party the responsibility to make a decision respecting certain matters subject to the contract, that provision is enforceable and the third party's decision is final in the absence of fraud, bad faith or the failure to exercise honest judgment. The parties dispute the extent to which that rule applies in the context of the committee's determination as to the application of restrictive covenants. Both rely on *Hanson v. Salishan Properties, Inc.*, 267 Or 199, 515 P2d 1325 (1973), to support their respective views.

*Hanson* involved an interpretation of covenants that provided for restriction of

> "the height of improvements on the leased premises * * * to the end that the view of other Salishan tenants shall be preserved to the greatest extent reasonably possible." 267 Or at 202.

The covenants further provided:

> "In general, all homes will be single story, except on sites which lend themselves to daylight basements, or split levels. Views from all lots will be safeguarded to the extent reasonably possible." 267 Or at 202.

The covenants provided for review of plans by an architectural review committee. The review committee approved the defendants' construction of a two-story house, and the plaintiffs sought a permanent injunction. The court first determined the legal significance of the restrictions. It held that the restrictions were not stated in absolutes, and that whether a view is "preserved to the greatest extent reasonably possible" was a matter of opinion. The court further concluded that the review committee had been delegated the responsibility for making that determination. The court said that it would not disturb the review committee's decision in the absence of a finding that that committee had not preserved the view of all lots to the extent reasonably possible. 267 Or at 204. Despite the defendants' contention, the only real "deference" given by the court to the review committee's decision was that that committee's factual determination would not be disturbed *in the absence of contrary findings by the court*. The court, thus, reserved for itself the authority to make new findings. That amounts to no deference to the review committee. The court did not pretend to defer to the review committee's interpretation of the terms of the covenant. *See also Donaca v. Ivall*, 44 Or App 121, 605 P2d 709 (1980); *Shipler v. Van Raden*, 41 Or App 425, 429, 599 P2d 1141, *mod* 42 Or App 535, 601 P2d 487 (1979), *mod* 288 Or 735, 608 P2d 1162 (1980). We conclude that when the issue on appeal concerns an interpretation of covenants, that responsibility is assigned exclusively to the court, unless the agreement expressly provides otherwise.

In this case, the committee explained that its decision not to require an adjustment in defendants' design to accommodate plaintiffs' view was based in part on its reasoning that, as owners of an east-side lot, plaintiffs have no protected westerly view.

■ Article III, section 4, restricts the height of improvements to protect the view of "adjacent" land owners. The term adjacent is not defined in the covenants. Whether, as used in the covenants, it includes properties across the street from one another is a question of intent, in the light of the circumstances at the time of their formulation. *See Palmer v. Johnston*, 110 Or App 538, 541, 823 P2d 1024, *rev den* 313 Or 74 (1992). Plaintiffs point out that the committee has decided

in at least two other circumstances that homeowners have protected views across streets. Apart from what the committee has done in other cases, however, the question that we must answer is whether its decision in *this* case represents a correct interpretation and application of the covenants.

Absent a definition of "adjacent" in the amended covenants, we search for its common meaning. Cases interpreting that term have held that it is a "relative one," which has different meanings under different circumstances. It sometimes means adjoining, contiguous, or abutting, and sometimes means near to or neighboring. Its meaning is determined principally by the context in which it is used and the facts and circumstances of the case. The Supreme Court has held that the term adjacent may include nonabutting property. *See, e.g., Kampstra v. Salem Hts. Water Dist.*, 237 Or 336, 340, 391 P2d 641 (1964). In *Woosley v. Transamerica Premier Ins. Co.*, 112 Or App 93, 826 P2d 1054 (1992), we held that an insurance policy that provided coverage for personal property in the plaintiff's mobile home or in a fully enclosed " 'adjacent structure located on [their] premises' " did not cover property destroyed "on non-adjoining premises located in a different city." 112 Or App at 96. (Bracket theirs.)

Dictionary definitions are not particularly helpful. They show that the term could reasonably encompass either of the two argued-for meanings. The definitions provided in *Webster's Third New International Dictionary* 26 (1976), illustrate that, as used to describe things of the same type, the term

"indicates either side-by-side proximity or lack of anything of the same nature intervening."

*See also Black's Law Dictionary* 38 (5th ed 1979).

There is some evidence concerning what the drafters of the covenants might have intended by use of the term. The original covenant regarding view provided that "a lot shall not materially restrict the view of *other* lot owners." (Emphasis supplied.) The amended covenants substituted "adjacent" for "other," thereby indicating an intention that an owner's right to protection of view extend to something less than all the properties in the subdivision. View was, nonetheless, regarded as significant. The testimony at trial

shows that the subdivision was marketed under a common development scheme as being made up of view properties and that a lot's view was a primary consideration in the purchase of property. View and the protection of view were of great importance to plaintiffs.

In the light of the overall purpose of the development to provide view lots, and in the absence of language in the covenant giving the term "adjacent" its narrowest meaning, such as "adjacent and contiguous" or "adjacent and adjoining," we conclude that lots can be "adjacent" to one another even if they are separated by a street. Accordingly, we hold that plaintiffs' and defendants' lots were adjacent and that plaintiffs are entitled to protection of their view over defendants' lot.

Additionally, we find that defendants' house materially obstructs plaintiffs' view. The evidence shows conclusively that the construction of defendants' home has virtually obliterated plaintiffs' view of the Three Sisters and Broken Top mountains. It necessarily follows that defendants have breached the covenants. In light of our holding that defendants have breached the covenants, we conclude that it is appropriate to remand the case to the trial court for the fashioning of a remedy.

Because of our disposition of the appeal, it follows that defendants cannot prevail on their cross-appeal concerning their award of attorney fees.

On appeal, reversed and remanded for determination of remedy; affirmed on cross-appeal.