Argued and submitted March 4, decision of Court of Appeals reversed; case remanded to the Court of Appeals for further proceedings November 21, 1996

John G. VALENTI
and Margaret M. Valenti,
*Respondents on Review,*

*v.*

Benjamin T. HOPKINS
and Susan Hopkins,
*Petitioners on Review.*

(CC 90-CV-0323-TM; CA A74166; SC S42001)

926 P2d 813

John R. Faust, Jr., of Schwabe, Williamson & Wyatt, Portland, argued the cause for petitioners on review. With him on the briefs was Michael W. Peterkin, Bend.

James E. Mountain, Jr., of Harrang Long Gary Rudnick P.C., Salem, argued the cause and filed the briefs for respondents on review.

Jon A. Chandler, Lake Oswego, filed a brief on behalf of *amicus curiae* Oregon State Home Builders Association.

Ray W. Shaw, Joel L. Augee, and Melinda Iresta Roy, Salem, filed a brief on behalf of *amicus curiae* Oregon Association of Realtors.®

Gerald A. Martin and C. E. Francis, Bend, filed a brief on behalf of *amicus curiae* Central Oregon Board of Realtors.

Before Carson, Chief Justice, and Gillette, Van Hoomissen, Fadeley, Graber, and Durham, Justices.**

VAN HOOMISSEN, J.

Fadeley, J., dissented and filed an opinion.

---

** Unis, J., retired June 30, 1996, and did not participate in this decision.

## VAN HOOMISSEN, J.

This is an action to enforce restrictive covenants in a residential subdivision. After the subdivision's Architectural Control Committee (ACC) approved defendants' house plans, plaintiffs brought this action, asserting that defendants' construction would obstruct plaintiffs' view in violation of the subdivision's restrictive covenants. The trial court denied injunctive relief. The Court of Appeals gave no deference to the ACC's determination and, on *de novo* review, held that defendants had violated the restrictive covenants. The Court of Appeals, therefore, reversed and remanded the case to the trial court to fashion a remedy. *Valenti v. Hopkins*, 131 Or App 100, 883 P2d 882 (1994). The issue is whether the decision of a contractually created private architectural control committee is reviewable *de novo* by the courts, with no deference being given to the committee's interpretation of the enabling restrictive covenants or to its conclusions on the merits. For the reasons that follow, we reverse the decision of the Court of Appeals.

In 1988, plaintiffs purchased their two-story home in the West Ridge Subdivision in Deschutes County. At that time, plaintiffs had an unobstructed view of the Cascade mountains to the west and of the Paulina and Ochoco mountains to the east. At the time plaintiffs purchased their home, the subdivision's restrictive covenants provided that "[t]he height of improvements * * * on a lot shall not materially restrict the view of other lot owners" and that the ACC "shall be the sole judge of the suitability of such heights."

In 1989, the owners of the lots in the subdivision approved amended covenants that control the design of newly constructed homes. Article I of the amended covenants provides in part:

"Section 1. *Architectural Control Committee.*

"(A) An Architectural Control Committee is hereby established. This Committee shall consist of three (3) lot owners with the selection being made by an annual vote of all then lot owners to be held on or about May 1st of each year, with each lot owner entitled to one vote regardless of the number of lots owned. * * *

"(B) *Generally, the Committee will be responsible for approval of plans and specifications of private areas and for promulgation and enforcement of its rules and regulations governing the use and maintenance of private areas and improvements thereon.*

"\* \* \* \* \*

"(D)  Neither the Architectural Control Committee nor any member thereof shall be liable to any lot owner for any damages, loss or prejudice suffered or claimed, on account of any action or failure to act of the Committee, or a member thereof, provided only that the member, in accordance with actual knowledge possessed by him/her, has acted in good faith.

"Section 2. *Architectural Control Committee Consent.*

"*Consent of the Architectural Control Committee is required for all new construction,* exterior remodel, landscaping, and any major improvements upon the lot. In all cases, the following provisions shall apply:

"\* \* \* \* \*

"(B) *Architectural Control Committee Discretion and Guidelines.*

"*The Architectural Control Committee may at its discretion withhold consent with respect to any proposal which the Committee finds would be inappropriate for the particular lot or would be incompatible with the neighboring homes and terrain within West Ridge Subdivision. Considerations such as* size, *height,* color, design, *view, effect on other lots,* disturbance of existing terrain and vegetation, *and any other factor which the Committee reasonably believes to be relevant, may be taken into account by the Committee in determining whether or not to consent to any proposal.*" (Emphasis added.)

Article II (Restrictions On Use Of Property) provides in part:

"Section 2. *Construction and Alteration of Improvements in Private Areas.*

"No person, association, or owner shall construct or reconstruct any improvement on any lot, make any change in any lot, whether by excavation, fill, alteration of existing drainage, \* \* \* unless such person, association, or owner

has first obtained written consent thereto from the Architectural Control Committee."

Article III (Architectural Rules) provides in part:

"Section 4. *View and Building Height*.

"*The height of improvements or vegetation and trees on a lot shall not materially obstruct the view of adjacent lot owners. The Architectural Control Committee shall judge the suitability of such heights and may impose restrictions.*[1] If the Architectural Control Committee determines there is such obstruction of view of adjacent lot owners, written notice shall be delivered to the offending owner. If after 30 days the improvement, vegetation or trees are not removed or reduced in height, as approved by the Architectural Control Committee, the Committee shall arrange to have the removal or reduction completed, charging the owner of the lot the reasonable costs for work done. This section is not to be read as justification to create views not present when the lot was originally purchased." (Emphasis added.)

Article IV (General Provisions) provides in part:

"Section 2. *Enforcement*.

"Enforcement shall be by proceedings at law or in equity against any person or persons violating or attempting to violate any Covenants either to restrain violation or to recover damages and may be brought by any owner in the subdivision. In the event that suit or action is initiated, the prevailing party shall be entitled to recover all costs and reasonable attorney's fees incurred in such action."

Plaintiffs' lot and house are on the east side of West Ridge Avenue. In 1990, defendants purchased a lot across West Ridge Avenue to the west of plaintiffs' home. In March 1990, defendants submitted their house plans to the ACC. Plaintiffs objected on the ground that defendants' proposed house would obstruct their view of the mountains to the west. Plaintiffs understood that the view from their first floor would be obstructed by any house built on defendants' lot; however, they expected the ACC to protect the view from

---

[1] Before 1989, the covenants provided that the ACC was to be the "sole judge" of the suitability of heights. The record before this court does not disclose why the owners amended the covenants in 1989 to provide that the ACC "shall judge" the suitability of heights.

their second floor. The ACC rejected defendants' plans for reasons unrelated to plaintiffs' objection. Defendants then submitted alternate plans for a two-story house, which the ACC approved. Defendants later withdrew those plans and, instead, proposed to build another type of house of the same basic design. With some alterations unrelated to height, the ACC approved those plans. Most importantly, the ACC interpreted the subdivision's amended covenants to mean that, because plaintiffs' home was located on the east side of West Ridge Avenue, plaintiffs' lot was not "adjacent" to defendants' lot within the meaning of Article III, section 4, and, therefore, that plaintiffs did not have a protected western view.[2] After the ACC approved defendants' plans, they began construction. As expected, their house obstructed plaintiffs' second-floor view of the mountains to the west.

Plaintiffs then filed this action in circuit court, seeking injunctive relief and specific performance of the covenants or monetary damages. The trial court concluded that the ACC had not acted "arbitrarily or unreasonably" in approving defendants' plans, dismissed plaintiffs' complaint, and awarded defendants attorney fees. The court relied primarily on *Lincoln Const. v. Thomas J. Parker & Assoc.*, 289 Or 687, 617 P2d 606 (1980) (recognizing a "fraud, bad faith, or failure to exercise honest judgment" standard of review for decisions of private entities like the ACC). Plaintiffs appealed, contending that the trial court erred in failing to

---

[2] In a letter to plaintiffs, in the context of an unrelated dispute with another neighbor, the ACC explained its position as follows:

"Previous committees have established ground rules concerning a home-owner's view that are essentially as follows:

"1. Persons with homes on the West side of the street shall have views to the West out the back of their homes.

"2. Persons with homes on the East side of the street shall have views out the back of their homes to the East.

"* * * * *

"Western views, of the Cascade Mountains, are considered the prime views and this is reflected in the fact that lots on the West side of Westridge sell for considerably more than lots on the East side. No one on the East side of the street is guaranteed a Westerly view."

Although plaintiffs argue that the ACC's specific *decision* in their case was "arbitrary, capricious, unfair and unreasonable," they do not argue that the ACC lacked authority *to interpret the covenants*.

find that defendants had breached the amended covenants, in failing to conclude that the ACC's decision was "arbitrary and unreasonable," and in failing to grant appropriate relief from defendants' alleged breach. Defendants cross-appealed, arguing that plaintiffs' complaint did not state sufficient facts to constitute a claim, because they did not challenge the reasonableness of the ACC's decision. Defendants also argued that the trial court's award of attorney fees was inadequate.

The Court of Appeals rejected defendants' first cross-assignment of error and then concluded that it was not required to defer to the ACC's interpretation of the enabling covenant or to its findings on the merits, relying on *Hanson v. Salishan Properties, Inc.*, 267 Or 199, 515 P2d 1325 (1973). The court proceeded to review the trial court's decision *de novo* and concluded that, within the meaning of the covenants, plaintiffs' and defendants' lots were "adjacent" and that plaintiffs were entitled to protection of their view to the west over defendants' lot. The court found that defendants' house materially obstructed plaintiffs' view and concluded that defendants had breached the covenants. Accordingly, the court remanded the case to the trial court to fashion a remedy. *Valenti*, 131 Or App at 109. We allowed defendants' petition for review to determine the proper role of the courts in reviewing decisions of a contractually created private design committee charged with enforcing a subdivision's restrictive covenants.

This court has referred to restrictive covenants, such as those at issue here, as "contractual obligations imposed upon all lot owners." *Ludgate v. Somerville*, 121 Or 643, 648, 256 P 1043 (1927). Generally, restrictive covenants such as those found here are enforceable. *See Alloway v. Moyer*, 275 Or 397, 400-01, 550 P2d 1379 (1976) (the defendant must comply with a reasonable construction of the restriction); *Donaldson v. White*, 261 Or 314, 493 P2d 1380 (1972) (restrictive covenant enforced); *Snashall v. Jewell*, 228 Or 130, 363 P2d 566 (1961) (same). As a general rule, the construction of a contract is a question of law. Unambiguous contracts must be enforced according to their terms; whether the terms of a contract are ambiguous is, in the first instance, a question of

law. *Pacific First Bank v. New Morgan Park Corp.*, 319 Or 342, 347, 876 P2d 761 (1994).

In *Hanson*, the plaintiffs sought a permanent injunction prohibiting the defendant, a neighboring leaseholder, from building a specific kind of house on his leased beachfront lot that, the plaintiffs alleged, would interfere with their views of the beach and the ocean. Lease covenants provided that lessees

> "shall restrict the height of improvements * * * to the end that the view of other * * * tenants shall be preserved to the greatest extent reasonably possible." *Hanson*, 267 Or at 202.

Pursuant to "Architectural Considerations" incorporated into the lease, the defendant submitted construction plans to an architectural committee, which approved them. After the plaintiffs obtained a favorable judgment from the trial court, this court reversed, stating:

> "The more serious restriction is that height will be limited to the end that views 'shall be preserved to the greatest extent reasonably possible.' *The sort of a structure which will so preserve the view is, of course, a matter of opinion* [emphasis added]. The documents in question leave such a decision to the Architectural Committee. The committee was of the opinion that a few feet of additional height to the [defendants'] house would obstruct less view of consequence than would be the case if the usable square footage in the second story were added to the first floor, thereby creating additional width. * * * Unless this court can find that the decision of the Architectural Committee *did not* [original emphasis] preserve the view of upland owners to the greatest extent reasonably possible, that committee's decision should not be disturbed. From the evidence in this case we cannot say with any conviction that its decision did not so preserve plaintiffs' view." *Id*. at 204.

*Hanson* did not purport to establish, even in *dictum*, a nondeferential standard of review for decisions of architectural committees charged with applying and enforcing restrictive covenants of a subdivision.

*Friberg v. Elrod et al.*, 136 Or 186, 296 P 1061 (1931), was a suit to foreclose a mechanic's lien for labor performed

under a construction contract. The contract provided that "[t]he engineer shall be the sole judge of the * * * quality of the work done by the contractor" and that "[a]ll disputes or disagreements between the parties hereto shall be submitted to and decided by the engineer and his decision shall be binding upon both parties." *Id.* at 189. The defendant argued that the plaintiff's lien claim already had been decided by the engineer and that the engineer's final estimate of the amount to be paid to the plaintiff under the contract should be accepted. This court agreed, holding:

> "Where a contract stipulates that a certain engineer is expressly clothed with the broad authority to determine all questions arising in relation to the work, * * * and provides that after the completion of the work the engineer shall make a final estimate of the amount of work done, and the value thereof to be paid by the builder, * * * the contract does not create a mere naked agreement to submit differences to arbitration, such stipulations are of the very essence of the contract, and such agreement is not subject to revocation by either party, and *an award * * *, in the absence of fraud or of such gross mistake as would imply bad faith or a failure to exercise honest judgment, is binding on both parties to the contract* * * *." *Id.* at 194-95 (emphasis added).

*Friberg* applied a deferential standard of review to carry out the expressed intention of the parties to avoid costly and time-consuming litigation and to promote finality by upholding the decision of a contractually designated third party. The consistent policy of the law is to encourage the private resolution of disputes.

  *Lincoln* was an action for breach of contract between a road builder and a supplier of gravel. In that case, this court recognized:

> "Parties to contracts often provide for resolution of disputes by a skilled, neutral third person. The rationale is that a quick resolution of their differences is commercially more practicable than a potentially expensive lawsuit. When a contract clearly expresses that a third person is to make final decisions respecting specified matters, such

agreement is enforceable. Such third person's determination is final, absent a showing of fraud, bad faith, or a failure to exercise honest judgment." 289 Or at 692-93 (citing *Friberg*, 136 Or at 195).[3]

The *Lincoln* court explained the rationale for deferring to a designated third-party's decision:

"Normally, when contracting parties agree to abide by determinations made by a third person, they do so in the belief that the third person will make such determinations in good faith, and in a fair, impartial manner. To a substantial degree, the honesty, integrity and objectivity of such third person is a factor in the decision of one to agree that a third person make such determinations." *Id*. at 693.

■ In this case, plaintiffs argue that the ACC's members are neither "skilled" nor "neutral" and, therefore, that their decision is not entitled to deference under the *Friberg* standard. We reject that argument. Plaintiffs approved the covenants—including the provisions for the creation and authority of the ACC—knowing that the ACC's members would be owners of lots in the subdivision who, like themselves, would not necessarily have any expertise in the matters they might be asked to resolve. We proceed to examine the restrictive covenants here to determine whether the *Friberg* standard of review is applicable in these circumstances.

The subdivision's covenants expressly provide that "the [ACC] will be responsible for approval of plans and specifications of private areas and for promulgation and enforcement of its rules and regulations governing the use and maintenance of private areas and improvements thereon." They further provide that "[c]onsent of the [ACC] is required for all new construction" and that "[t]he [ACC] may at its discretion withhold consent with respect to any proposal which the [ACC] finds would be inappropriate for the particular lot or would be incompatible with the neighboring homes and terrain within [the subdivision]." The ACC is given broad

---

[3] Strictly speaking, the court's restatement of the *Friberg* principle was not essential to the decision in *Lincoln* because, in *Lincoln*, this court determined that neither of the alleged contractually designated "third parties" had made a binding determination. 289 Or at 693. But the *dictum* was a strong one, and we find it to be instructive.

authority to consider "height, * * * view, effect on other lots * * * and any other factor it reasonably believes to be relevant" in determining whether or not to consent to any proposal. The covenants provide that "[t]he height of improvements * * * on a lot shall not materially obstruct the view of adjacent lot owners," but they further provide that "[t]he [ACC] *shall judge* the suitability of such heights and may impose restrictions." (Emphasis added.) We take the use of the words "shall judge" to mean that in the context of the broad range of authority granted, the ACC is intended to be the final arbiter both as to the applicable law and the facts, with respect to height restrictions.

In summary, the collective wording of the restrictive covenants set out above clearly expresses that the ACC is to make final decisions respecting the relevant issues. We therefore hold that the standard of review articulated in *Friberg* and discussed in *Lincoln*—review for fraud, bad faith, or failure to exercise honest judgment—is the appropriate standard of review of the ACC's interpretation of the language in the covenants here and of its decision on the merits. Plaintiffs neither have alleged nor proved that the ACC's interpretation of the language in the covenants or its decision on the merits in this case was the result of fraud, bad faith, or a failure to exercise honest judgment.

We hold that the Court of Appeals erred in deciding *de novo* that defendants had breached the covenants. We reverse the decision of the Court of Appeals and remand the case to that court for consideration of defendants' assignment of error concerning attorney fees.

The decision of the Court of Appeals is reversed. The case is remanded to the Court of Appeals for further consideration.

**FADELEY, J.,** dissenting.

I dissent because the majority opinion permits a subdivision's architectural committee to determine the extent of its own arbitration jurisdiction, contrary to law. I also dissent because the majority's analysis and result leave this dispute stranded without access to any forum in which it may be

heard, and its future application will leave many other potential disputes between lot owners without any mechanism for their resolution. That defeats the purpose of arbitration.

## I. ARBITRATORS IMPERMISSIBLY REWROTE VIEW PRESERVATION COVENANTS

In *Sloan v. Journal Publishing Co.*, 213 Or 324, 324 P2d 449 (1958), the court touched upon the scope of an arbitrator's authority. The court stated:

> "The general rule is that an arbitrator derives his authority solely from the submission agreement of the parties, and the extent of his authority is normally a question of law which is reviewable by the courts.
>
> "It is also the rule that an agreement that an arbitrator shall be the final judge of his own jurisdiction must be clear and unequivocal before it will be given effect." *Id.* at 366 (citations omitted).

In *Brewer v. Allstate Insurance Co.*, 248 Or 558, 436 P2d 547 (1968), the court found an arbitrator's decision not reviewable. Plaintiff's statutory exception to the award rested on the ground that their arbitrator exceeded his power in that he determined that the claimant had a certain burden of proof. The court rejected plaintiff's claim. The court held that "[t]he arbitrator acts within the bounds of his authority not only when he decides a question of law correctly according to judicial standards, but also when he applies the law in a manner which a court would regard as erroneous." 248 Or at 561-62.

The *Brewer* court, *id.* at 562, quoted *Mahaffy v. Gray*, 242 Or 522, 525, 410 P2d 822 (1966), for the proposition that "[n]either a mistake of fact or law vitiates an award." That is so because the purpose of arbitration is to avoid litigation, by the device of settling all disputes that fall in the area committed by contract to arbitration.

Based on those cases, the Oregon rule is that the court will review questions of an arbitrator's authority to determine the scope of the arbitrator's jurisdiction, but will not review the determination of a matter of law concerning the merits of a dispute, when that determination is made by an arbitrator with express authority to make it. With that

distinction in mind, I turn to the facts of this dispute between lot owners in the same subdivision.

The subdivision is named "West Ridge," apparently because of its superlative, year-round view of snow-capped mountains to the west. Plaintiffs and defendants are neighbors who live across the street from each other on West Ridge Avenue. All lots in the subdivision are subject to restrictive covenants to which each purchaser must agree as part of the act of becoming a lot owner in that subdivision. The covenants form a contract among all owners of lots in the subdivision, a contract that restricts the property rights of all owners from the time that they purchase a lot.[1]

The subdivision covenants provide, in relation to "[t]he height of improvements * * * on a lot," that each of the "neighboring homes within the West Ridge Subdivision" is to be protected from proposed developments that "would be incompatible with the neighboring homes." The subdivision's Architectural Control Committee (committee) is required to include in its incompatibility decision-making:

"Considerations such as size, height, * * * view, effect on other lots."

Article III, section 4, of the covenants also expressly provides:

"The height of improvements * * * on a lot shall not materially obstruct the view of adjacent lot owners. The [committee] shall judge the suitability of such heights and may impose restrictions."

The committee refused to make any suitability decision in this dispute, thus defeating the purpose for arbitration. The committee justified that refusal on two bases.

A. *No West View*

The committee[2] denied *any* guarantee to plaintiffs of *any* view to the west, notwithstanding the provisions of the

---

[1] In this respect, the binding contract created by the covenants may be properly classified as a contract of adhesion.

[2] The committee members are elected annually but, under the majority's "rule," the decision of a committee that is no longer in office prevents resolution of any new dispute where the lot ownerships are not contiguously adjoining.

covenants. The westerly view is of relatively nearby Cascade peaks.

The committee refused to "judge the suitability of" the height of defendant's new construction. To explain that refusal, the committee simply relied on a past committee's declaration that no one on the east side of the street had *any* view to the west *at all*, a denial that impinges on half of the lots on West Ridge Avenue.

At the time that the committee changed the covenants to limit them to views in one direction, its members expressly explained that action as based on the price of the lots. West-side lots cost more. East-side lots cost less. Therefore, the committee declared, regardless of the provisions of the covenants, no east-side lot had any right at all to a view of the snow-capped mountains from their front, west-facing windows, whether the windows were upstairs or down. In short, the committee rejected jurisdiction over half of the disputes or suitability determinations committed to them by the covenants.

That ruling, although it doubtless simplified the committee's task, cannot be justified under the covenants or the law applicable to them, because it alters the jurisdiction that is committed to the arbitrators in the covenant contract by limiting that jurisdiction to only some disputes, while providing no other method for resolution of other disputes arising under the covenants. The limitation means that the arbitrators will refuse, as they did in this case, to hear and decide real disputes. Under the majority interpretation, no litigation is possible because the matter is committed to arbitration, but no arbitral resolution is possible in these orphan disputes either.

B.  *Not Adjacent*

Later, during this litigation, the committee decision was also stated to be based on an interpretation of the word "adjacent" to not include, for east-side lot owners, any lots neighboring to the west. Lots located across the street from each other were said, on behalf of the committee, not to be "adjacent." That limitation of arbitral jurisdiction is based on

an erroneous meaning of the word. And, again, the committee uses that construction to limit its own jurisdiction, stranding half of the potential disputes committed to them by the plain language of the covenants.

In *Kampstra v. Salem Hts. Water Dist.*, 237 Or 336, 391 P2d 641 (1964), a water district sought to charge commercial property owners for the cost of laying a water main. The court discussed the water district's determination that the property was "adjacent," stating:

> "The term 'adjacent' is a relative one and has been held, under other property-assessment statutes, to include non-abutting property which lies sufficiently near the subject improvement to be benefited by the improvement. *Lapp v. Marshfield*, 72 Or 573, 577, 144 P 83 (1914). See also *Clark v. City of Salem*, 61 Or 116, 119, 121 P 416 (1912)." 237 Or at 340.

The two cases cited in *Kampstra* appropriately discuss the term "adjacent." In *Clark*, 61 Or at 119, the court declared: "The term 'adjacent' includes property in the neighborhood of the improvement though not actually touching thereon. 25 Am. & Eng. Enc. Law, (2 ed.) 1191." In *Lapp*, 72 Or at 577, another action involving collecting an assessment for public improvements, the court stated:

> "Neither is there any validity to plaintiff's contention that his land does not abut on the street to be improved, and is therefore immune from assessment. The city charter of Marshfield provides that assessments of this character may be made upon adjacent property. This includes lands which, while not immediately abutting on the improvement, lie so near thereto as to be benefited by it: Page & Jones, Taxation by Assessment, § 622; *Kirkpatrick v. City of Dallas*, 58 Or. 511 (115 Pac. 424) [1911]; *Town of Woodruff Place v. Raschig*, 147 Ind. 517 (46 N.E. 990) [1897]; *Hennessy v. Douglas County*, 99 Wis. 129 (74 N.W. 983) [1898]."

*Black's Law Dictionary*, 41 (6th ed 1990), joins our case law by defining "adjacent" much more broadly than the committee. Definition of a different word, "adjoining," taken from the same source provides a useful and telling contrast. It appears that the committee interpreted the covenant consistent with the legal definition of "adjoining," and not "adjacent." In *Black's*, those contrasting definitions are:

"Adjacent. Lying near or close to; sometimes, contiguous; neighboring. *Adjacent* implies that the two objects are not widely separated, though they may not actually touch, while *adjoining* imports that they are so joined or united to each other that no third object intervenes. *See* Adjoining." *Ibid.* (citations omitted).

"Adjoining. The word in its etymological sense means touching or contiguous, as distinguished from lying near to or adjacent. To be in contact with; to abut upon. And the same meaning has been given to it when used in statutes. *See* Adjacent." *Ibid.* (citation omitted).

## II. THE AUTHORITIES DO NOT SUPPORT REWRITING COVENANTS

None of the case authorities cited and relied on by the majority fits this case. None involves a change in jurisdictional covenants initiated by an arbitral committee or by any other persons established under the contract as the "judge" of suitability.

The majority relies on *Friberg v. Elrod et al.*, 136 Or 186, 296 P 1061 (1931), to establish the "standard of review" for suitability decisions made by a local subdivision committee under recorded covenants. But the *Friberg* decision was about a "sole judge" who was empowered by contract to establish the amount owed under a mechanic's lien, not about application of realty covenants. *Friberg* was based on a contract that gave an engineer-arbiter "broad authority to determine all questions" and made the engineer "sole" judge about amounts owed. Equally important to the *Friberg* decision was the holding that this *court* and not the arbiter interpreted the contract, which plainly gave the arbiter authority to determine amounts due to persons performing work. In *Friberg*, this court did not "defer" to any interpretation of the contract by the arbiter; there was no such interpretation. Nor did the court abdicate the court's responsibility to construe the agreed jurisdiction of the arbiters as set out in a contract. Rather, in *Friberg*, this court itself interpreted and enforced the terms of the contract.

On the question of enforcement, the terms of the West Ridge Subdivision covenants expressly provide that:

"Enforcement shall be by proceeding at law * * * against any person or persons violating or attempting to violate any Covenants." Article IV, section 2, of the amended subdivision covenants, titled "Enforcement."

Neither the express terms of the covenants nor the decision in *Friberg* empowers the local committee to rewrite the terms of the covenants to limit the kinds of disputes that come within the arbitrator's jurisdiction, as the committee did in this case.

Other cases cited and relied on by the majority do not permit that sort of rewriting of the covenants, let alone judicial "deference" to the rewritten terms. In *Hanson v. Salishan Properties, Inc.*, 267 Or 199, 515 P2d 1325 (1973), the covenant provided that neighboring views "shall be preserved to the greatest extent reasonably possible." *Id.* at 202. The local committee in that case acted to preserve the views to the greatest extent possible, as the committee saw it. The committee did not say: "No view at all in that direction." That is, the committee performed the function expressly assigned to it by the contract, as this court (not the committee) interpreted the contract. That case does not involve a "committee interpretation" of the terms of the contract.

*Lincoln Const. v. Thomas J. Parker & Assoc.*, 289 Or 687, 617 P2d 606 (1980), also cited by the majority is a case involving a contract to supply gravel. By its terms, that contract submitted all breach of contract disputes to a designated arbiter. In *Lincoln*, this court held:

"When a contract clearly expresses that a third person is to *make final decisions respecting specified matters*, such agreement is enforceable." *Id.* at 692 (emphasis added).

However, the court held that the contract itself must be followed and that, when a different person than the one contractually agreed upon had made the determination, that determination was not enforceable.

*Lincoln* supports the position taken in this dissent, as indeed, do all of the foregoing cases relied on by the majority. In accordance with *Lincoln*, this court should remand the case with instructions that the contract be enforced, that is,

that the committee must make an individual suitability decision that includes consideration of plaintiffs' view. The committee is the "judge" of that suitability issue as to construction of improvements, but the covenants in this case provide that, in making its determination, the committee is to consider the effect on the view from "neighboring" or "adjacent" lots. It does not say that the committee may take away the right to *all* westerly view from some lots. Moreover, nothing said in *Lincoln* removes from the court its legal duty of interpreting the scope of jurisdiction conferred by dispute resolution contracts involving real property rights.[3]

In brief, the majority mistakes both precedent and the terms of the covenant. Decisions of arbiters in a specific case, when made pursuant to a contract, are final. But interpretations that limit the scope of the committee's arbitral jurisdiction by rewriting the terms of the contract are neither supported by the terms of the contract, nor by the cases cited. Nonetheless, it is the committee rewrite limiting its jurisdiction and leaving many disputes concerning a blocked view without any mechanism for their resolution to which the majority defers, not the suitability decision actually made and based on the pertinent criteria from the covenant contract. Delegation by contract of the power to decide a dispute pursuant to the terms of the contract does not equal delegation of the power to alter the scope of jurisdiction of the arbitrators by altering the terms of the submission of disputes to them that is stated in the contract. The majority simply fails to note the difference and, by reason of that failure, errs.

I respectfully dissent.

---

[3] An arbitration may be common law, statutory, or court administered. Oregon has statutorily recognized and regulated arbitration for the purpose of settling disputes since 1925. Oregon Laws 1925, chapter 186, now codified as amended as ORS 36.300 to 36.365, and formerly codified as ORS 33.210 to 33.340. ORS 36.310, 36.335 and 36.355(1), especially paragraph (d), appear applicable here, although not mentioned by the majority.