Argued and submitted November 19, 1997, affirmed on appeal; affirmed in part and reversed and remanded in part on cross-appeal April 29, 1998

## Bruce F. TAYLOR
and Susan Taylor,
husband and wife,
*Respondents - Cross-Appellants,*

*v.*

## Stewart McCOLLOM
and Ann McCollom,
husband and wife,
*Appellants - Cross-Respondents,*

*and*

## Virginia W. COTTON
and Peter Cotton,
*Defendants.*

(90-2095-E-2; CA A91609)

958 P2d 207

Eugene J. Piazza argued the cause and filed the briefs for appellants - cross-respondents.

Carlyle F. Stoutt III argued the cause and filed the briefs for respondents - cross-appellants.

Before De Muniz, Presiding Judge, Deits, Chief Judge, and Haselton, Judge.

HASELTON, J.

## HASELTON, J.

Defendants Stewart and Ann McCollom appeal from a judgment awarding plaintiffs Bruce and Susan Taylor damages for breach of Covenants, Conditions and Restrictions (CC&Rs), arising out of defendants' construction of a home that allegedly materially impaired plaintiffs' view from their home.[1] Plaintiffs cross-appeal, assigning error to the trial court's refusal to enter an injunction requiring defendants to modify their home so as to lower their roof line and alleviate the alleged view impairment. Plaintiffs also assert that the trial court erred in denying attorney fees. We affirm on the appeal and affirm in part and reverse in part on the cross-appeal.

This dispute arises out of the construction of neighboring houses in Ashland's Quailhaven subdivision. That subdivision, which was platted in 1986, was a joint project of the owner, Virginia Cotton, and her son, Peter. Peter, an architect, assisted his mother in selling lots, and, as a condition of purchase, buyers were required to execute "designer agreements," retaining Peter as the designer for their homes. Peter and Virginia were also two of the three members of the Architectural Committee which, under the Quailhaven CC&Rs, was charged with reviewing and approving home designs.

In 1986, defendants purchased Quailhaven Lot 4, which was downhill from Lots 2 and 3, which plaintiffs later purchased. Although defendants executed a "designer agreement" with Peter and paid him the requisite fee, they retained an old friend, Saul Zaik, to do the actual design work for their home. Zaik designed a one-story house, with a vaulted cathedral-style ceiling and a clerestory[2] to admit

---

[1] "Defendants" in this opinion refers to the McColloms. Virginia and Peter Cotton, who also were defendants at trial, are not parties on appeal.

This is the second time this case has come before us. We previously reversed a summary judgment entered in favor of the McColloms and the Cottons. *Taylor v. McCollom*, 119 Or App 1, 849 P2d 1123 (1993).

[2] A clerestory is an "outside wall of a room or building (as a church) carried above an adjoining roof and pierced with windows which admit light to the interior." *Webster's Third New Int'l Dictionary*, 421 (unabridged ed 1993).

additional light. The projected height of defendants' home was 23 feet.

In January 1989, defendants provided Peter with preliminary drawings of their house, including the roof and clerestory design, as well as elevations from which the house's height could be readily calculated. In responding to defendants' submission, Peter stated, "Plans look great. Aside from rising out of the sight a bit more than I had hoped, the one thing that strikes me is the lack of a guest arrival (entry) connection to the street."

In June 1989, roughly six months after defendants submitted their preliminary plans to Peter, but before defendants started building, plaintiffs began looking into buying property at Quailhaven. On two occasions, Peter met plaintiffs and showed them Lot 2, which was uphill from defendants' lot; on a third occasion, he showed them the adjacent Lot 3, which was also uphill and directly behind defendants' lot. On each occasion, plaintiffs emphasized that view preservation was critical to their decision to buy and build; that was especially so for Susan Taylor, for whom the views to the north toward Mt. Grizzly were reminiscent of the landscape around Yreka where she grew up. On each occasion, Peter represented that under the Quailhaven CC&Rs, plaintiffs' view would be preserved. On one visit, Peter had plaintiffs climb a step ladder to a height approximating the projected level of their first floor and told them that their view would be unimpaired at that level. On the same visit, Peter referred to a downslope power pole, and told plaintiffs that the roofline of defendants' as-yet-unbuilt home on Lot 4 would be no higher than the pole. Peter also represented that defendants' home would be a low-built "berm" house. Ultimately, plaintiffs bought both Lots 2 and 3.

Plaintiffs began building their home in September 1989. Construction on defendants' home started several months later, in early 1990. In March 1990, shortly before plaintiffs moved into their home, they first became aware of a possible view impairment when a header on defendants' home was put into place. Plaintiffs' concerns heightened a few days later, when the trusses for defendants' cathedral-style roof were put in place. Plaintiffs met with defendants

and asserted that defendants' construction and design violated various provisions of the CC&Rs, including, particularly, Section 8.1. That provision reads:

> "It is important that Quailhaven owners restrict the height of improvements on their lots and the height of trees and vegetation growing thereon in order that the view of other Quailhaven residents *shall be preserved to the greatest extent reasonably possible*[.]" (Emphasis added.)

Plaintiffs suggested, as a possible compromise, that defendants eliminate the clerestory.[3] Defendants met with their architect, Zaik, and ultimately refused to delete the clerestory—a modification that would have cost approximately $10,000.

Plaintiffs then initiated a complaint to the Quailhaven Architectural Committee, asserting that defendants' home violated several provisions of the CC&Rs, including the "view preservation" covenant, Section 8.1. Under Section 7.1 of the CC&Rs, the Architectural Committee was authorized "to regulate the external design, appearance, location and maintenance of any and all improvements on the Property and any and all landscaping thereon in accordance with provisions of this Declaration and the [Design Review] Manual."[4] On April 26, 1990, Virginia Cotton wrote to plaintiffs, stating, "The full Architectural Committee has met. We regret that you feel so strongly about the matter, but we do not believe that a violation of the Covenants, Conditions and

---

[3] At the meeting, Stewart McCollom told plaintiffs that, if he were in their position, he would be "very upset" by the house blocking their view, and he also advised plaintiffs to consider hiring a lawyer. The context of those remarks is unclear. Although plaintiffs cast those comments as admissions of liability, it is at least equally plausible that they were expressions of sympathy and an implicit invitation to seek redress against the Cottons for Peter's misrepresentations.

[4] Section 3.3 of the Design Review Manual, entitled "Committee Discretion," reads as follows:

> "It is recognized that this manual does not contain specific requirements for every situation that may require Committee approval; therefore, the Committee will necessarily exercise discretion in many instances in approving or disapproving of a specific proposal. It is further recognized that a proposal may deserve consideration on its own merit even though it does not meet a specific standard set forth in this manual; therefore, the Committee is authorized, in its sole discretion, to approve a proposal notwithstanding that it may conflict with a standard set forth in this manual."

Restrictions exists."[5] Defendants completed their house, and this litigation ensued.

Plaintiffs' complaint asserted claims against the Cottons, based on Peter's misrepresentations. In addition, plaintiffs asserted two alternative claims against defendants: (1) an equitable claim, alleging that defendants' home violated the CC&Rs, including Section 8.1, and seeking an injunction ordering defendants to "remove and lower the roof to preserve plaintiffs' view"; and (2) if equitable relief was denied, a claim for breach of the CC&Rs, seeking damages for depreciation of property value resulting from that breach. Plaintiffs also pleaded that, under Section 14.3 of the CC&Rs, they were entitled to recover attorney fees from defendants on either alternative claim.

At trial, at the close of evidence, the court invited argument on plaintiffs' equitable/injunctive claim. Defendants' counsel argued that the evidence established that the Architectural Committee had approved defendants' home design and, particularly, had determined that that design did not violate Section 8.1 of the CC&Rs. Defendants further argued that that determination precluded the trial court from granting equitable relief and asked that the court, in equity, render findings concerning the nature and effect of the Architectural Committee's determination.

Without ruling on defendants' request, the court submitted plaintiffs' fraud claim against the Cottons and their claim against defendants for breach of the CC&Rs to the jury. The jury ultimately returned a verdict against the Cottons, awarding compensatory damages of $15,000 and punitive damages of $38,000. The jury also rendered a verdict against defendants for breach of the CC&Rs, giving the following responses to special interrogatories:

"Question 1.   Do you find, based upon a preponderance of the evidence, that defendants McColloms' home as built did not preserve the view from

---

[5] The parties dispute whether that letter or another exhibit, which purports to memorialize minutes of the Architectural Committee meeting on April 15, 1990, evinces a valid decision by the Committee, entitled to deference under *Valenti v. Hopkins*, 324 Or 324, 926 P2d 813 (1996). Given our analysis and disposition, we do not reach that question.

the Taylors' residence to the greatest extent reasonably possible?

"ANSWER: Yes.

"Question 2. Do you find, based upon a preponderance of the evidence presented by the parties, that the Taylors' home and/or property has suffered depreciation as a result of the violation?

"ANSWER: Yes.

"Question 3. What are the total damages incurred by plaintiffs resulting from the depreciation of their property value based upon McColloms' violation?

"ANSWER: $16, 500."

Thereafter, the trial court, which had reserved ruling on plaintiffs' equitable/injunctive claim against defendants, rendered findings and conclusions. The court determined that the defendants' home violated Section 8.1 of the CC&Rs; that the value of plaintiffs' property had been decreased by $16,500 because of the view impairment; that, when the dispute first arose in March 1990, defendants' roof could have been lowered, and the clerestory removed, for $10,300; and that the present costs of modifying defendants' home to lower the roof height to 16 feet would be between $50,000 and $70,000. The court rendered no findings about whether the Architectural Committee had, in fact, approved defendants' design, much less findings concerning the nature and effect of the Architectural Committee's alleged action. The court denied injunctive relief, concluding, "Requiring these defendants to lower the pitch of their roof is unfeasible and inequitable in that the damages associated with so doing are disproportionate to the injury caused by the loss of view." Consequently, the court entered judgment against defendants for $16,500, based on the jury's award on the alternative claim for breach of the CC&Rs. The court also denied plaintiffs' petition for attorney fees.

Defendants appeal the judgment for breach of the CC&Rs. Plaintiffs cross-appeal, assigning error to the denial

of injunctive relief and the denial of attorney fees. Defendants' sole argument on appeal is that, under *Valenti v. Hopkins*, 324 Or 324, 926 P2d 813 (1996), the trial court erred in failing to give the Architectural Committee's purported approval preclusive effect. Before addressing the substance of that argument, it is essential to briefly review *Valenti* and then to put defendants' present arguments, based on *Valenti*, into the procedural context of what occurred at trial.

In *Valenti*, the plaintiffs purchased a home, with an unobstructed mountain view, in a subdivision. The subdivision's CC&Rs specified that new construction be approved by the Architectural Control Committee (ACC). The defendants subsequently purchased a nearby lot and submitted their house plans to the ACC. The plaintiffs objected to the defendants' proposed design as impairing the view from the second floor of their house, but the ACC ultimately approved the defendants' plans, concluding that, under the operative view protection provision of the CC&Rs, the plaintiffs' lot was not "adjacent" to the defendants' lot. The plaintiffs filed an action in circuit court seeking, alternatively, injunctive relief or damages. The trial court dismissed the plaintiffs' complaint, concluding that, because the ACC had not acted "arbitrarily or unreasonably," its decision was binding.

The plaintiffs appealed, and we reversed. *Valenti v. Hopkins*, 131 Or App 100, 883 P2d 882 (1994). We concluded that, under *Hanson v. Salishan Properties, Inc.*, 267 Or 199, 515 P2d 1325 (1973), the ACC's construction of "adjacent lot" in the view protection covenant was not entitled to preclusive effect. *See Valenti*, 131 Or App at 107 ("[W]hen the issue on appeal concerns an interpretation of covenants, that responsibility is assigned exclusively to the court, unless the agreement expressly provides otherwise."). We further concluded that, given the broadly protective purpose of the view preservation covenant, the plaintiffs' home was "adjacent" to the defendants' lot, and we remanded to the trial court to determine the proper remedy. *Id.* at 108-09.

On review, the Supreme Court reversed. The essence of the court's analysis is that, where restrictive covenants clearly express that a designated third party (in

*Valenti,* the ACC) "is to make final decisions respecting the relevant issues," those decisions are preclusive unless the decision maker's determination was tainted by "fraud, bad faith, or failure to exercise honest judgment." *Valenti,* 324 Or at 335, (citing *Lincoln Const. v. Thomas J. Parker & Assoc.,* 289 Or 687, 692-93, 617 P2d 606 (1980), and *Friberg v. Elrod et al.,* 136 Or 186, 194-95, 296 P 1061 (1931)). Because the plaintiffs had not pleaded or proved that the ACC's decision was so tainted, that decision was binding. *Valenti,* 324 Or at 335.

So much for *Valenti.* At the time this case was tried, the Supreme Court had accepted review of our decision in *Valenti* but had not yet issued its reversal. The parties' arguments to the trial court were framed and phrased accordingly. Defendants contended that our decision was "bad law" and that the Architectural Committee's decision was absolutely preclusive. Conversely, plaintiffs asserted that the Architectural Committee had not rendered any decision approving defendants' home and, even if it had, the trial judge was free, under our decision in *Valenti,* to construe and apply the CC&Rs, and especially Section 8.1, *"de novo."*[6] In urging their respective absolutist positions, neither party anticipated the "fraud, bad faith, or failure to exercise honest judgment" exception that the Supreme Court ultimately endorsed in *Valenti*—and, thus, neither party attempted to relate the evidence to that principle.

However skewed the parties' arguments may have been at trial, defendants' *Valenti*-based assignment of error fails for an even more fundamental reason: Defendants' arguments at trial were not directed against the source of the judgment they now attack. As described above, the judgment here was based on the *jury's* award of damages for defendants' breach of the CC&Rs—and not on the claim for equitable/injunctive relief, which the trial court denied.[7] Conversely, defendants' arguments concerning the preclusive

---

[6] Plaintiff's counsel characterized our holding in *Valenti:* "The court can sit *de novo* and determine whether what the architectural review committee did was reasonable."

[7] The equitable claim included no request for monetary relief other than an award of attorney fees and costs.

effect of the Architectural Committee's purported decision were advanced solely in the context of argument on the equitable claim. At no point did defendants ever advance a *Valenti*-like argument that the Architectural Committee's action precluded the jury's consideration of the legal claims for breach of the CC&Rs. In particular, defendants do not identify, much less assign as error, any denial of a motion for directed verdict or any refusal to give peremptory jury instructions embodying *Valenti's* analysis. Indeed, immediately before presenting closing argument on the equitable claim, defense counsel commented:

> "Should the Court find that, in fact, the McCollom home does not violate the CC&Rs and Design Review Manual, I would nevertheless ask that that finding not be binding upon the jury in their determination of that issue. I would like that issue to go to the jury regardless of the Court's finding."

Whatever the abstract merits of defendants' present *Valenti*-based arguments,[8] they were not directed to the jury's consideration of the claim for breach of the CC&Rs. Accordingly, we sustain the judgment based on the jury's verdict and affirm on the appeal.

On cross-appeal, plaintiffs first assign error to the trial court's denial of injunctive relief. Plaintiffs argue, particularly, that such relief is appropriate because defendants knowingly violated Section 8.1 and then exacerbated that violation by continuing to build—and, thus, unilaterally increasing the costs of mitigation—after plaintiffs complained of the violation. Plaintiffs further argue that, in all events, the impairment of their view is so substantial that, under the "balance of hardships" principle, defendants should be compelled to lower their roof, regardless of the substantial attendant costs.

Defendants respond that, under *Valenti*, the Architectural Committee's purported approval precludes the court from considering whether defendants' home violates Section

---

[8] Given disputed evidence concerning the regularity of the Architectural Committee's process and purported approval of defendants' home, a *Valenti*-based directed verdict would have been, at least, problematic.

8.1 and, thus, from granting relief based on such a determination. Defendants further argue that they did not violate Section 8.1 at all, much less do so knowingly, and that the costs of mitigation—which all parties agree would be between $50,000 and $70,000 dollars—substantially outweigh plaintiffs' loss from any view impairment.

■■     On *de novo* review, ORS 19.415(3), we conclude that, regardless of *Valenti's* application,[9] plaintiffs are not entitled to injunctive relief. In general, in equitable view impairment cases, courts apply the "relative hardship" or "balance of hardships" test. Under that analysis, the damage from the view impairment is weighed against the costs of mitigation and, "if the damages associated with the removal of the encroaching structure are disproportionate to the injury which the encroachment causes," injunctive relief is inappropriate. *Tauscher v. Andruss*, 240 Or 304, 308-09, 401 P2d 40 (1965). Where, however, the defendant has continued to build notwithstanding notification of a clear violation of a restrictive covenant, the court may order injunctive relief, even if the balance of hardship cuts against the plaintiff. *See, e.g., Swaggerty v. Petersen*, 280 Or 739, 749, 572 P2d 1309 (1977); *Glover v. Santangelo*, 70 Or App 689, 692, 690 P2d 1083 (1984), *rev den* 298 Or 705 (1985). The application of that "knowing violation" exception may depend on a variety of considerations, including the clarity of the standard violated, the extent or severity of the violation, the availability of reasonable mitigation measures at the time the violation was brought to the defendant's attention, and the extent to which the defendant's subsequent conduct exacerbated the costs of mitigation.

---

[9] As noted, the trial court rendered no findings concerning the nature and effect of the Architectural Committee's process and, particularly, whether that process fell within *Valenti's* "fraud, bad faith, or failure to exercise honest judgment" exception. Although our review is *de novo*, such findings on this record could well have turned on assessments of credibility (particularly concerning the Cottons' participation in the Architectural Committee process), which the trial court was uniquely positioned to make and to which we would have accorded substantial deference. *See State ex rel Juv. Dept. v. G. P.*, 131 Or App 313, 319, 884 P2d 885 (1994). The lack of such findings impairs our review of the *Valenti* issue—and we need not remand for such findings if we can base our disposition on an independent and sufficient ground.

■ Here, plaintiffs invoke the "knowing violation" exception and, in all events, contend that they are entitled to prevail even under a "balance of hardships" analysis. Based on our review of the record, we disagree. It would serve no purpose to bench or bar to engage in an extensive, fact-intensive discussion of our reasoning. Briefly, however, we note that the language of Section 8.1 (views "shall be preserved to the greatest extent reasonably possible") is not nearly so clear, objective, and precise as the language of the violated covenants in cases invoking the "knowing violation" principle. *See, e.g., Swaggerty*, 280 Or at 741 ("[N]ot more than one single-family residential structure shall be erected or maintained on any lot[.]"); *Glover,* 70 Or App at 691 ("[N]o second-story shall ever be erected on any building on said Lot 10[.]").[10]

■ We find, moreover, that defendants did not willfully violate that standard: A year before they began construction, defendants provided Peter Cotton with plans showing their home's projected height, and, except for a passing comment about the home "rising out of the sight a bit more than I had hoped," Peter never expressed any reservations about the house's height, the design of the roof, or any impairment of plaintiffs' view. Certainly, Peter, who designed plaintiffs' home, never suggested that defendants' design might violate Section 8.1. Moreover, after plaintiffs voiced their complaints, Virginia Cotton informed the parties that the Architectural Committee had rejected those complaints. Whatever the accuracy or validity of Virginia's representations—and however the *Cottons'* self-interest might have infected the Architectural Committee's decision—there is no question that defendants relied on those representations in good faith.[11]

---

[10] Quailhaven's CC&Rs and Design Manual do not include a maximum height restriction. Nor do they include any prohibition on two-story houses—the height of defendants' home, 23 feet, approximates that of a two-story house. At trial, plaintiffs' contractor acknowledged that "the average height of an upper-end home" in the Rogue Valley was "substantially more than 16 feet" and that defendants' home was not "excessively high for an upper-end home."

[11] At oral argument, there was some dispute as to whether defendants stopped all building activity until after the Architectural Committee had acted. From the record, it is impossible to determine whether that was so. It does appear, however, that after plaintiffs raised their concerns, defendants stopped building "for a week or two."

■ Proceeding to the "balance of hardships" analysis, we concur in the trial court's assessment. The parties submitted, as exhibits, videotapes and photographs of the view from plaintiffs' home and the impairment of that view. Those materials show that plaintiffs have a panoramic view from the first floor of their home and that defendants' roof and clerestory substantially impinge on the view at one end of the panoramic range.[12] The blockage of the view from plaintiffs' kitchen is particularly significant. However, the "best" parts of the view, including Mt. Grizzly and most of the valley to the north of plaintiffs' home, are unimpaired.[13]

Conversely, the cost to defendants of tearing off and lowering their roof would be very substantial. Plaintiffs' own architectural expert acknowledged that such structural modifications would cost between $50,000 and $70,000. On balance, we conclude that the costs of mitigation are "disproportionate to the injury [that] the encroachment causes." *Tauscher*, 240 Or at 309. Accordingly, we affirm the denial of injunctive relief.

Plaintiffs' second assignment of error on cross-appeal challenges the trial court's denial of their petition for attorney fees, which was based on Section 14.3 of the CC&Rs. That section, entitled "Enforcement," reads:

> "Declarant, the Association, the owners of Lots or Dwellings within the Property, the holder of any recorded mortgage on any Lot or Dwelling shall have the right to enforce all of the covenants, conditions, restrictions, reservations, easements, liens and charges now or herein/after imposed by any of the provisions of this Declaration as may appertain specifically to said bodies or owner by any proceeding at law or in equity. Failure by any of them to enforce any covenant or restriction herein contained shall in no event be deemed a waiver of their right to do so thereafter. In the event suit or action is commenced to enforce the terms and provisions of this Declaration, the prevailing party shall be

---

[12] The view from the second floor of plaintiffs' home is unimpaired.

[13] At trial, plaintiffs presented expert evaluation testimony that their damages from the impaired view, representing depreciation of their home's value, were approximately $49,000. The jury returned a verdict for roughly one-third of that amount, $16,500. The trial judge's findings endorsed that figure. Both the judge and the jury had the benefit of an on-site view of the property.

entitled to its attorney's fees, *to be set by the appellate court.*
In addition thereto, the Association shall be entitled to its
reasonable attorney's fees incurred in any enforcement
activity taken on delinquent assessments, whether or not
suit or action is filed." (Emphasis added.)

The trial court concluded that, because it was not an "appellate court," it could not award fees. In so holding, the court observed that the emphasized language, "though somewhat illogical, says what it says."

Plaintiffs argue to us, as they did to the trial court, that, because literal application of Section 14.3 as written would produce incongruous results, the term "appellate court" must be disregarded as a "scrivener's error":[14]

"A reasonable construction of this paragraph is that the prevailing party is entitled to attorney's fees incurred both at trial and on appeal. It simply does not make sense to have the right to attorney's fees contingent upon an appeal to be set by an appellate court.

"* * * * *

"In the instant case, it is clear from viewing the matter as a whole that Section 14.3 contained a scrivener's error."[15]

Conversely, defendants assert that the language is unambiguous and that "it may well have been included as an attempt to induce litigants to consider carefully the monetary risk of appealing a trial court decision."

We agree with plaintiffs that the term "to be set by the appellate court" is susceptible to reformation. In *Sea Fare v. Astoria*, 6 Or App 605, 610-11, 488 P2d 840 (1971), we described the controlling analysis:

"Every presumption should be invoked in favor of the instrument in question as written on the theory that the

---

[14] Plaintiffs do not contend that the trial court can somehow be an "appellate court" within the meaning of Section 14.3.

[15] Plaintiffs also assert that, based on the last sentence of Section 14.3, they have a reciprocal entitlement to attorney fees under ORS 20.096(1). However, as the trial court noted, that sentence refers only to enforcement actions by the Quailhaven Homeowners Association to collect delinquent assessments, and this action is not one by the Association to collect assessments. Accordingly, reciprocity under ORS 20.096(1) does not apply.

sanctity of written agreements should be preserved. *Teachers' Fund Ass'n. v. Pirie*, 147 Or 629, 34 P2d 660 (1934).

"In addition to overcoming the presumption in favor of the instrument, a party seeking reformation of the same on the basis of a 'scrivener's' error has the further burden of proof to show that the reformation is necessary. He must support that burden with 'clear and convincing evidence.' *Weatherford v. Weatherford*, 199 Or 290, 257 P2d 263, 260 P2d 1097 (1953). * * *

"The recognized grounds for reformation are: (1) A mutual mistake of fact. See, e.g., *Ray v. Ricketts*, 235 Or 243, 383 P2d 52 (1963). (2) Mistake of law where both parties misapprehend the legal import of the words used or use words through mutual mistake or inadvertence. See, e.g., *Harris Pine Mills v. Davidson*, 248 Or 528, 435 P2d 310 (1968). (3) Mistake of one party and fraud on the part of the other party. *Markwart v. Kliewer*, 75 Or 574, 147 P 553 (1915)." (Citations omitted.)

■     Here, we conclude that, in the context of the CC&Rs, use of the phrase "to be set by the appellate court" clearly and convincingly evinces a "[m]istake of law where both parties misapprehend the legal import of the words used or use words through mutual mistake or inadvertence." *Sea Fare*, 6 Or App at 611. The contract, as written, contemplates that parties who prevail at trial shall "be entitled to attorney fees," but only to the extent that those fees are "set by the appellate court." In other words, Section 14.3 is premised on the assumption that this court has authority to fix trial attorney fees in the first instance. That assumption, at least in these circumstances, is a "mistake of law." The Court of Appeals can *review* trial courts' awards of attorney fees, *see, e.g.*, ORS 20.220; *Bennett v. Minson*, 309 Or 309, 787 P2d 481 (1990) (entitlement to attorney fees is reviewed as matter of law); *Kidney Association of Oregon v. Ferguson*, 315 Or 135, 140-41 n 9, 843 P2d 442 (1992) (determination of reasonableness of amount of fees is reviewed for "abuse of discretion"), and we can, in appropriate cases, award attorney fees incurred on appeal, *see, e.g.*, ORS 19.440; ORAP 13.10. But private parties cannot by private agreement confer or impose on this court authority that it is not granted by statute. Specifically, parties cannot unilaterally obligate this court to determine, in the first instance, issues of entitlement to and

reasonableness of fees incurred at trial. That authority rests in the trial courts. *See generally* ORS 20.075 to ORS 20.107; ORCP 68.

■ We thus conclude that Section 14.3 must be reformed to delete "to be set by the appellate court." So reformed, the text provides that "in the event suit or action is commenced to enforce the terms and provisions of this Declaration, the prevailing party shall be entitled to its attorneys fees." Under that language, plaintiffs are entitled to their reasonable attorney fees incurred at trial. *See, e.g., Malot v. Hadley*, 102 Or App 336, 340, 794 P2d 833 (1990). The determination of such fees is to be made, in the first instance, by the trial court. ORCP 68. Accordingly, we reverse the court's denial of attorney fees and remand for further proceedings.

Affirmed on appeal; on cross-appeal, denial of equitable relief affirmed, and denial of attorney fees reversed and remanded for further proceedings.