Argued and submitted April 5, reversed and remanded in part; otherwise affirmed
August 22, 2001

Andy TURUDIC
and Luisa Turudic,
*Appellants,*

*v.*

William STEPHENS,
dba Susan Estates Residents' Association,
*Defendant,*

*and*

SUSAN ESTATES HOMEOWNERS ASSOCIATION,
and John Albin,
*Respondents.*

CV95-094; A95493 (Control)

Andy TURUDIC
and Luisa Turudic,
*Appellants,*

*v.*

William STEPHENS,
dba Susan Estates Residents' Association,
*Defendant,*

*and*

SUSAN ESTATES HOMEOWNERS ASSOCIATION
and John Albin,
*Respondents,*

*and*

Matthew DERBY,
William Meyer
and Meyer, Elzinga & Gannett,
*Other Respondents.*

CV95094; A106404
(Cases Consolidated)

31 P3d 465

Margaret H. Leek Leiberan argued the cause and filed the briefs for appellants.

Matthew Derby filed the brief for respondents in A95493 before consolidation. With him on the brief was Danny Lang & Associates.

Thomas W. Brown argued the cause for respondents Susan Estates Homeowners Association and John Albin. With him on the supplemental brief following consolidation in A16404 were Wendy M. Margolis and Cosgrave, Vergeer & Kester LLP.

Barbara L. Johnston and Brisbee & Stockton filed the supplemental brief following consolidation in A106404 for respondents Matthew Derby, William Meyer, and Meyer, Elzinga & Gannett.

Before Haselton, Presiding Judge, and Deits, Chief Judge, and Wollheim, Judge.

HASELTON, P. J.

### HASELTON, P. J.

These are consolidated appeals from the trial court's judgment on the merits (A95493) and from the court's subsequent denial of motions to set aside that judgment and for sanctions (A106404). The principal issue on the first, "merits" appeal is whether the plaintiffs' keeping of two pet cougars on their property violated the covenants, conditions, and restrictions (CCRs) of a subdivision. We affirm the denial of post-judgment relief in A106404. However, on the "merits" appeal, A95493, we affirm in part, reverse in part, and remand for further proceedings.

The material facts are as follows: Plaintiffs Andy and Luisa Turudic are the owners of two American mountain lions,[1] more commonly known as cougars. In 1993, plaintiffs decided to move from Missouri to Oregon, in part because Oregon law, subject to certain statutory restrictions and local ordinances, permits the keeping of exotic animals such as cougars. *See* ORS 609.205 *et seq.*[2]

Plaintiffs purchased property in Susan Estates, a small subdivision in rural Yamhill County, in an area zoned "very low density, 5 acre minimum." There are no zoning restrictions on the type of animals that can be kept on a particular piece of property.

Before moving to Susan Estates, in researching the property, plaintiffs obtained copies for two sets of CCRs. The first set, entitled "Declaration of Covenants and Restrictions of Susan Estates" (original CCRs), was adopted at the time of the original development in 1981. The second set, entitled "First Amendment to Declaration cf Covenants and Restrictions" (amended CCRs), was adopted in 1987 as a comprehensive revision to the original CCRs. The parties agree that

---

[1] Mutchka, a female, is a South American variety; Pete Puma, a male, is a North American variety.

[2] ORS 609.309 states the policy underlying Oregon's exotic animal law:

"It is the policy of this state that the keeping of exotic animals be regulated so as to ensure the health, welfare and safety of those animals and to ensure the security of facilities in which they are kept, so as to avoid undue physical or financial risk to the public. It is the policy of this state that regulation place no more burden upon the keepers of exotic animals than is required to accomplish the purposes expressed in this section."

the amended CCRs apply to plaintiffs' property and the issues regarding both plaintiffs' cougars and the holding pen, and that the original CCRs apply to a collateral dispute we describe below, 176 Or App at 180, regarding the portable toilet on the Albin property.[3]

Plaintiffs began building their home in late spring 1994. Construction of the cougar holding pen, which meets or exceeds state standards for animal care and public safety[4] and has been approved by the Oregon Department of Fish and Wildlife, began in mid-September and was completed on October 13, 1994. Plaintiffs did not obtain the approval of the Susan Estates Homeowners' Association board before undertaking or completing either their home or the cougar pen project.

At 3:00 in the morning on October 19, 1994, plaintiffs, without notice to their neighbors, moved the cougars into the holding pen. Two days later plaintiffs first became aware of their neighbors' concerns about the cougars when a deputy sheriff contacted them in response to a neighbor's complaint.[5]

On November 8, 1994, a majority of the members of the Susan Estates homeowners' association met to discuss the cougar issue. Plaintiffs were not invited. At that meeting, the members agreed that the cougars were a nuisance and should be removed from plaintiffs' property. They also resolved to disapprove any "cougar-cage outbuildings." Consequently, on November 30, 1994, counsel for the Association

---

[3] Apparently, the original CCRs applied to all the lots in the development. When the amended CCRs were adopted in 1987, the Albin property was specifically exempted from those amended provisions.

[4] *See* ORS 609.325 (requiring that exotic animals be kept "under conditions of confinement or control that, given the nature of the animal, would be imposed by a reasonable and prudent keeper to avoid physical or financial risk to the public as a result of escape of the animal or otherwise"); OAR 603-011-0710 (detailing the design requirements for outdoor cages used to house exotic felines); OAR 635-044-0035 (requiring that any wildlife held in captivity be maintained in a manner that is sanitary, safe and not unhealthful for the animals).

[5] The deputy sheriff confirmed that the pen met state wildlife requirements and did not pursue the matter further.

wrote to plaintiffs, expressing concerns both about the cougars and about plaintiffs' failure to seek Board approval for both their house and the cougar pen.

Plaintiffs responded by offering to build a secondary safety fence around the existing cougar pen, and by submitting house plans to the Board. Plaintiffs did not submit plans for the cougar pen. On February 22, 1995, a representative for the Association wrote to plaintiffs, stating that plaintiffs' house plans had been approved but that the cougar pen was rejected under the "nuisance provisions" of the CCRs:

> "Plans for construction of current outbuildings or any future outbuildings for housing of cougars have not yet been submitted but construction has also been observed on-site. Such buildings are not approved and further, Association hereby directs such outbuildings to be removed immediately, and no further construction of cages for housing cougars or any other felid shall be constructed. This action is predicated on the basis of the nuisance provisions of Susan Estates Covenants and Restrictions."

While the conflict over the cougars continued, another dispute between plaintiffs and their neighbors developed: Defendant John Albin and members of his family own a 36-acre vineyard next to plaintiffs' property. Under state administrative rules, farmworkers must be provided with sanitary toilet and hand-washing facilities during those times—roughly 50 days a year for the Albin vineyard—when they are working on the land, including the fall harvest. Sometime after plaintiffs moved into their home, a bright turquoise and white portable toilet or "porta-potty" was situated on the Albin property, directly in front of plaintiffs' front picture windows.[6] Despite plaintiffs' request, defendant Albin refused to move the toilet, even during those times (over 300 days a year) when no work is occurring on the land. Although the porta-potty is, in fact, movable, defendant Albin asserted that relocating it during periods of inactivity would be burdensome.

---

[6] The porta-potty is situated next to a water faucet, which can be used for hand-washing, as required by state law.

In March 1995, plaintiffs brought this action. Plaintiffs sought a declaratory judgment that neither the pen nor the cougars could be prohibited under the amended CCRs and that, in all events, the Association was precluded from enforcing the CCRs because of the doctrine of laches. Plaintiffs further argued that the Association breached its obligations when it failed to follow the annual meeting provisions of the amended CCRs, failed to enforce the nuisance provisions as to other lot owners, and acted unreasonably and capriciously in denying approval for the cougar pen. Finally, plaintiffs asserted they were entitled to an injunction requiring removal of the Albin porta-potty because it was a "temporary storage building or shack" in violation of the original CCRs.[7]

Defendants counterclaimed, alleging that the cougars were a nuisance under both the CCRs and common law. Defendants also filed two claims for injunctive relief—one requiring plaintiffs to remove the cougar pen because they had failed to obtain approval for the structure as required by the CCRs, and the other precluding plaintiffs from keeping cougars on their property.

The case was tried to the court. The court first considered, and rejected, plaintiffs' complaints about the porta-potty. In an oral ruling, later reduced to judgment, the court refused to compel the porta-potty's removal, determining that it constituted a permitted "agricultural use" and was not a temporary storage building or shack prohibited under the original CCRs.

The trial court subsequently issued a detailed letter opinion addressing the remaining cougar- and holding pen-related issues. That opinion rested on three determinations that are central to this appeal. *First*, plaintiffs' maintenance of the cougars was not a nuisance under either the common law or the amended CCRs. *Second*, nevertheless, plaintiffs' maintenance of the cougars was not a permitted "residential use" under the CCRs. *Third*, construction of the cougar pen

---

[7] Plaintiffs' first amended complaint based that injunctive claim on the amended CCRs. At trial, however, the court allowed plaintiffs to amend that complaint to conform to the evidence, which showed that the original CCRs were the only provisions applicable to the Albin property.

without the Board's prior approval violated the amended CCRs.[8] Consequently, given its determination that the maintenance of the cougars was not a nuisance but that plaintiffs had otherwise violated the amended CCRs, the court entered a judgment rejecting plaintiffs' claims for declaratory relief and breach of contract, and rejecting defendants' nuisance-related counterclaims, but directing that both the cougars and the holding facility be removed from plaintiffs' property.[9]

In December 1996, plaintiffs filed their initial, "merits" appeal (A95493). Plaintiffs raised six assignments of error, challenging the allowance of injunctive relief against the maintenance of the cougar pens and the cougars—and, concomitantly, the rejection of plaintiffs' claims for breach of the CCRs and declaratory relief—as well as the refusal to compel the removal of the porta-potty from the Albin vineyard.

Before that appeal was fully at issue, plaintiffs raised a plethora of procedural challenges pertaining, *inter alia,* to trial counsel's authority to prosecute the litigation on behalf of the Association. Plaintiffs asserted those challenges, in part, through a motion to set aside the judgment, ORCP 71 B, and a related motion for sanctions pursuant to ORCP 17 D. The trial court denied those motions, and, in May 1999, plaintiffs filed a second appeal (A106404), challenging that denial. The two appeals were then consolidated, and both are now before us.

---

[8] The court also determined that enforcement of the CCRs was not barred by laches both because the delay was insufficient and because plaintiffs had "unclean hands" by virtue of failing to warn their neighbors about the cougars and then surreptitiously moving the animals onto the property.

[9] In particular, the court: (1) entered judgment for defendants on plaintiffs' first claim for declaratory and injunctive relief and plaintiffs' second claim for breach of contract; (2) entered judgment for plaintiffs on defendants' first counterclaim for an injunction for nuisance under the CCRs and on defendants Stephens' and Albin's fourth counterclaim for common-law nuisance and their fifth counterclaim for nuisance damages pursuant to ORS 105.505 *et seq.*; and (3) entered judgment for defendants on defendants' second counterclaim for an injunction requiring removal of the cougar pen and defendants' third counterclaim for an injunction requiring removal of the cougars. In addition, the court entered judgment for defendant Albin on plaintiffs' third claim for violation of the CCRs (the "porta-potty" claim).

The court subsequently stayed the injunctions pending appeal.

At the outset, and without further discussion, we affirm the trial court's disposition on the second appeal, A106404.[10] We turn to the first, "merits" appeal.

We begin with the cougars. The amended CCRs, which all parties agree apply to plaintiffs' property, authorize the Board to regulate "the use * * * of the Property in such a manner as to preserve and enhance lot and structure values, farming, and to maintain the natural vegetation and topography." Amended CCRs, Art IV, sec 2. Limitations on "use" are set forth in Article V, section 1, which provides, in pertinent part:

"(b) *Use of the Property.* Property may be reasonably and normally used for agricultural farming, tree farming or residential use only.

"(c) *Nuisances.* No nuisance shall be permitted to exist or operate upon any Property so as to be detrimental to any other Property in the vicinity thereof or to its occupants. The decision of the Association as to what is a nuisance is presumptively correct. No normal or reasonable use of the Property, as described in subparagraph (b) above, shall be a nuisance."

Here, as noted, the trial court concluded that the cougars were not a nuisance under either the amended CCRs or common law. With respect to common-law nuisance, the court determined:

"I am sure, subjectively, the fear expressed by neighbors is real to them. However, the standard is an objective one, not a subjective one. I conclude that the potential for actual injury to a person is so remote that the fear of the neighbors cannot be said to be objectively reasonable. The reasons given by the defendant for their fears are based on anecdotal incidents rendered inapplicable to this case by the

---

[10] At first blush, our disposition of the "merits" appeal would seem to obviate any need to address the second appeal—*i.e.*, if we are reversing and remanding those aspects of the original judgment that are challenged on appeal, what need is there to address the denial of a motion to set aside that judgment? However, there are aspects of the original judgment, *viz.*, the trial court's entry of judgment for plaintiffs against defendants' nuisance-related counterclaims, that are not challenged by way of appeal or cross-appeal and, thus, remain in place (and could, at least potentially, be the object of post-judgment relief) notwithstanding our disposition of the "merits" appeal. Moreover, as noted, plaintiffs not only moved pursuant to ORCP 71 B, *but concurrently sought sanctions.*

secure holding facility in which the cougars in this case are held. Sufficient procedures are used to prevent escape. * * * The animals have not been shown to exhibit any effort to escape and are very unlikely to do so. Every step has been taken to ensure that escape or release will not occur, other than those steps—double or even triple door entry and secondary caging—which the neighbors will not allow. * * *

"I conclude that the keeping of these cougars, by these homeowners, in the state-approved holding facility, and other facts of *this case*, do not constitute a common law nuisance." (Emphasis in original.)

With respect to whether the cougars were a "nuisance" for purposes of the CCRs, the court concluded:

"[T]he court must avoid interpreting terms of the CCRs that have the effect of expanding their application beyond that intended by the drafters. The court must assume that the term 'nuisance' was selected to mean a common law nuisance. If the court were to interpret the word to mean 'use' or 'condition', a different result could occur, but those words were not used by the drafter.

"Nor is it not appropriate to use hindsight to conclude that the CCRs would have included a prohibition on keeping of cougars or similar exotic animals if this issue had been anticipated by the drafter. The absence of any restrictions on the type or number of animals suggests either the drafter did *not* intend such animals to be prohibited, *or* just did not consider it. Either way, it is not for the court to read into the CCRs something that is not there.

"Since this court has found that the keeping of the animals is not a common law nuisance, the declaration of the board, which is only 'presumptively', not 'conclusively' correct the nuisance provisions of the CCRs cannot be applied in this case." (Emphasis in original; footnote omitted.)

*Defendants do not challenge those determinations on appeal.*[11] Thus, for purpose of this appeal, we necessarily assume that plaintiffs' keeping of the cougars is *not* a nuisance under either the common law or the CCRs.

---

[11] As noted, *see* 176 Or App 182 n 9, the trial court entered judgment for plaintiffs against defendants' nuisance-related counterclaims. Defendants do not cross-appeal from those aspects of the judgment.

Given that posture, the issue narrows to whether keeping the cougars is a permissible "residential use" within the meaning of Article V, subsection 1(b). In construing the "residential use" provision of the amended CCRs, we follow the methodology prescribed in *Yogman v. Parrott*, 325 Or 358, 361-66, 937 P2d 1019 (1997). Under *Yogman*, "[t]o interpret a contractual provision, including a restrictive covenant, the court follows three steps." 325 Or at 361. First, the court must examine "the text of the disputed provision, in the context of the document as a whole. * * * If the provision is clear, the analysis ends." *Id.* If, however, the provision, when so viewed, remains ambiguous, the court must look to "extrinsic evidence of the contracting parties' intent" to resolve the ambiguity. *Id.* at 363. Finally, if that analysis is not dispositive, the court must look to relevant maxims of construction, including the maxim that restrictive covenants should be " 'construed most strictly against the covenant.' " *Id.* at 364-65 (quoting *Scott Co. v. Roman Catholic Archbishop*, 83 Or 97, 105, 163 P 88 (1917)); *see also Swanson v. Warner*, 125 Or App 524, 526, 865 P2d 493 (1993).

We begin, then, with the text and context of the "residential use" provision. Article V, subsection 1(b) of the amended CCRs describes, and limits, permitted uses of property within the subdivision:

> "*Use of the Property.* Property may be *reasonably and normally* used for agricultural farming, tree farming or *residential use only*." (Emphasis added.)

"Residential," as commonly understood, means "of, relating to, or connected with residence or residences." *Webster's Third New Int'l Dictionary*, 1931 (unabridged ed 1993). "Residence," in turn, means "the place where one actually lives or has his home * * *." *Id.* Thus, a "residential use" is one that involves activities generally associated with a personal dwelling.

Plaintiffs assert—and we agree—that keeping family pets is a "residential activity." *See Aldridge v. Saxey*, 242 Or 238, 249, 409 P2d 184 (1965) (concluding that covenant precluding the use of property for nonresidential purposes did not preclude the landowners from keeping 16 German Shepherds and 5 smaller dogs on their property). Plaintiffs

further offered uncontradicted testimony that they keep and care for the cougars as pets and not for any commercial purpose, such as breeding or exhibiting the animals for pay. Andy Turudic described the role that the cougars play in plaintiffs' lives:

> "[They] are an integral part of our family life. We have a very strong bond with our animals. * * * They give me and my wife both immense pleasure."

Thus, although the cougars may be more exotic than goldfish or hamsters, they are, nevertheless, indisputably family pets. Given that the cougars are family pets, and that their presence does not present a nuisance, the maintenance of the cougars constitutes a "residential use" within the meaning of the amended CCRs.

■  Defendants argue, however, that the amended CCRs permit only "reasonable" and "normal" residential uses—and assert that the keeping of cougars is neither. Defendants' argument fails for several reasons. First, as a textual matter, subsection 1(b) does not refer to "reasonable and normal * * * residential use." Rather, it states that the property may be *"reasonably* and *normally* used for [farming] or residential use only." (Emphasis added.) Thus, defendants' argument transforms adverbs into adjectives—a transformation that is particularly significant with respect to "normally" and "normal." It is one thing to say that property shall "normally"—*i.e.,* typically or usually[12]—be used for farming and residential purposes. It is quite another to say that property can only be used for "normal"—*i.e.,* presumably ordinary or decidedly nonexotic[13]—uses. Here, plaintiffs "normally" use their property for residential uses.

Second, to the extent that defendants claim contextual support for their "reasonable and normal" use argument, they point to the language of the nuisance provision, subsection 1(c). That reliance is, however, unavailing. Subsection

---

[12] *See Webster's Third New Int'l Dictionary,* 1540 (unabridged ed 1993) (defining "normally" to mean: "in a normal manner * * * COMMONLY, USUALLY").

[13] *See Webster's Third New Int'l Dictionary,* 1540 (unabridged ed 1993) (defining "normal" as "according to, constituting, or not deviating from an established norm, rule, or principle: conformed to a type, standard, or regular pattern: not abnormal").

1(c) refers to "normal *or* reasonable" use—that is, it is phrased in the disjunctive, not defendants' putative conjunctive. *See* 176 Or App at 183 (setting out text of subsection (1)(c)). Thus, any use described in subsection 1(b) that is *either* "reasonable" *or* "normal" is not a nuisance under subsection 1(c); a use that is not "normal," but is nevertheless "reasonable," must be permitted. Moreover, as noted, the trial court explicitly determined that the use here was not a "nuisance" under subsection 1(c). Logically, in so holding, the court necessarily determined that the use was either "normal" or "reasonable," or both. As noted, defendants do not contest that determination. *See* 176 Or App at 184 n 11.

Third, to the extent that the phrase "may be reasonably and normally used * * * for residential use only" remains ambiguous after resort to context, including subsection 1(c), the covenant is to be "construed most strictly against the covenant." *Yogman,* 325 Or at 364-65. Here, that canon assumes special significance because of the conduct of the Association, which seeks to enforce the covenant. As noted, plaintiffs have undertaken considerable efforts to eliminate potential risks associated with keeping the cougars. Those efforts have been highly successful—so successful that the trial court found that any risk from the cougars did not rise to the level of a common-law nuisance: "[T]he potential for actual injury to a person is so remote that the fear of the neighbors cannot be said to be objectively reasonable."[14] Nevertheless, marginal risks remain—*e.g.*, the risk of a trespassing child thrusting his or her hand into the cage or of a stranger releasing the cougars[15]—and plaintiffs offered

---

[14] In addition, plaintiffs have had both cougars declawed and have had Mutchka, the female, spayed. Plaintiff took those measures to further reduce any risk posed by the cougars and to eliminate the chance that Mutchka might attract wild cougars when she is in estrus. Mutchka's spaying also eliminated any caterwauling, a loud, scream-like sound that female cougars make when they are in heat.

[15] The trial court noted:

"The holding facility is very secure, though not 100% secure. It is constructed of wire mesh 'cyclone' weave of greater gauge than required, though the hold will admit a human hand, especially that of a child. Cement flooring and 12 inch high perimeter wall prohibit digging out or escape under the wire. The facility includes a cement 'den' that goes outside the wire, but is quite impenetrable. Though there are trees nearby, the likelihood of fallen tree damage sufficient to breach the cage is, in my view, very remote. The door to the facility is secured by three locks."

to undertake additional measures that would have eliminated even that potential. But the Association refuses to approve those reasonable measures. As the trial court explained:

> "The principal danger of escape comes from human error. Mr. Turudic appears to be a responsible animal owner interested not only in the best interest of his animals, but also in the safety of his own family and neighbors. The likelihood of deliberate removal from the facility is very remote, at least not by Mr. or Mrs. Turudic. Likewise, the probability of an escape due to the negligence of the Turudics is remote, though possible. A procedure is followed in which the cougars are chained to the fence before the door is opened for entry. A double door or 'sally port' entry could be constructed which would not allow opening of the inner door until the outer door is secure. *Mr. Turudic indicated his interest in adding this, but ironically, it is clear that this addition to the cage would not gain approval of the Susan Estates board.*
>
> "The holding facility would not protect a person from injury if the person stuck a hand or arm through the wire. While the danger would hopefully be recognized by an adult, a curious child might not. *Again, this potential problem could be addressed by construction of a secondary fence around the cage, but approval of the Susan Estates board would likely be required.*" (Emphasis added.)

In effect, the Association contends that plaintiffs' maintenance of the cougars is not "reasonable" because of the Association's own refusal to approve reasonable safety measures. The self-serving circularity is patent. Such a construction of subsection 1(b) cannot be squared with the "construed most strictly against the covenant" canon.

We thus conclude that the keeping of the cougars in their holding pen is a permitted residential use under Article V, subsection 1(b) of the amended CCRs. That conclusion, however, necessarily depends on the premise that the cougars' holding pen lawfully exists, and will continue to exist, on plaintiffs' property. Consequently, we turn to the trial court's determination that the cougar pen must be removed from the property.

■        In requiring the removal of the cougar pen, the trial court reasoned that the amended CCRs required plaintiffs to seek advance approval of all structures, that plaintiffs had failed to seek approval for the cougar pen, and that the Association, pursuant to its approval authority, had denied approval for the cougar pen. Thus, the Association's denial of approval, and concomitantly its authority to do so, were central to the trial court's ruling.[16]

We agree that, at least in the abstract, the amended CCRs give the Board the authority to either approve or disapprove construction of structures such as the cougar pen. In particular, the amended CCRs provide:

"No * * * building, fence or other structure shall be erected, placed or altered on any lot or parcel until the proposed building plans, plot plans showing the proposed location of such building or structures * * * have been approved in writing by the Board, its successors or assigns. Refusal or approval of plans or location may be based by the Board upon any reason, including purely aesthetic conditions, which, in the sole discretion of the Board, shall be deemed sufficient." Amended CCRs, Art V, sec 1(e)(2).[17]

That broad authority to approve or disapprove a structure for "any reason" is balanced, however, by Article IV, section 8 of the amended CCRs, which requires that, "In all matters relating to their duties as the Board of the Association, the Board must act reasonably and not capriciously." It is in light of those contractual rights and obligations that we assess the Board's actions here.

---

[16] In addition, the trial court rejected plaintiffs' arguments that the CCRs did not give adequate notice of their requirements and were so ambiguous as to be unenforceable; that the homeowners Association was either moribund or that its character had changed so fundamentally that the CCRs had lapsed and were unenforceable, *see, e.g., Swaggerty v. Peterson*, 280 Or 739, 746, 572 P2d 1309 (1977), that the Association was impermissibly engaging in "selective enforcement" in that it had not required preapproval of other structures; and that the enforcement of the CCRs' preapproval requirement was barred by latches. Given our analysis and disposition, we need not address those arguments, which are reiterated on appeal.

[17] The trial court, in ruling that the Board had authority to disapprove the cougar pen, relied upon a similar provision in the original CCRs. Given the fact that both the parties' pleadings and their arguments before this court are based on the amended CCRs, we rely on the applicable provisions in that document.

In its February 22, 1995, letter, the Board notified plaintiffs that structural approval for their cougar pen had been denied and that the cougar pen had to be removed. The letter further stated:

> "[N]o further construction of cages for housing cougars or any other felid shall be constructed. *This action is predicated on the basis of the nuisance provisions of the Susan Estates Covenants and Restrictions.*" (Emphasis added.)

No alternative explanation was given, and the evidence at trial did not show any additional bases for the Board's decision to deny approval of the plans. For example, there was no evidence that the Board denied approval because the cougar pen violated any "aesthetic" or design requirements of the CCRs[18] or because the cougars or their holding pen might adversely affect property values. Thus, the sole basis of the Board's denial of approval was its belief that maintenance of the cougars was a nuisance.

The trial court concluded that that denial was sufficient basis for enjoining plaintiffs to remove the cougar pen. We respectfully disagree for two related reasons. First, as the trial court explicitly concluded—and, again, defendants do not dispute on appeal—the cougars here are not a nuisance under the CCRs. Thus, while the Board may deny approval of a structure for any reasonable and not capricious reason,[19] the sole basis for disapproval here was legally erroneous—and, indeed, objectively unreasonable: "[T]he fear of the neighbors cannot be said to be objectively reasonable." Denial on such a basis is unreasonable and capricious.

Second, in a related sense, the Board's disapproval was, in purpose and effect, a collateral preclusion of a lawful permitted use under the CCRs. That is, the Board's disapproval was not, actually, of the structure *qua* structure but of the structure's function. The disapproval of the holding pen here is analogous to a homeowners' association refusing to approve plans for a home that includes a billiard room

---

[18] *See, e.g., Taylor v. McCollom*, 153 Or App 670, 958 P2d 207 (1998) (addressing enforceability of height and design standards under residential subdivision CCRs).

[19] *See* Amended CCRs, Art V, sec 1(e)(2); Art IV, sec 8.

because the association's members disapprove of billiards. Here, the keeping of pets, including exotic pets, in safe facilities is a permitted "residential use." *See* 176 Or App at 185-88. Consequently, so long as the structure for holding such pets does not violate some other (*e.g.*, design-related) requirement of the CCRs, the preapproval process cannot be employed as a subterfuge to preclude that permitted use. Such a denial is unreasonable and capricious.

We thus conclude that the trial court erred in entering judgment for defendants on their second counterclaim for an injunction compelling the removal of the cougars' holding facility and on their third counterclaim for an injunction compelling the removal of the cougars themselves from plaintiffs' property. We further, and concomitantly, hold that the trial court erred in entering judgment for defendants against plaintiffs' first claim for declaratory and injunctive relief and plaintiffs' second claim for breach of contract. We reverse those dispositions and remand for the trial court to consider the appropriate scope of relief on plaintiff's first and second claims for relief.

■    We turn, finally, to the remaining issues—whether the trial court erred in failing to require removal of the porta-potty during periods when it is not required for agricultural purposes. In so ruling, the trial court concluded that plaintiffs had failed to prove that the portable toilet was not agricultural and that, consequently, the toilet was a "agricultural use" permitted under Article VI, subsection 1(b) of the original CCRs. The trial court also rejected plaintiffs' argument that the toilet was a "shack" or a "temporary storage facility" that required Board preapproval.[20]

Plaintiffs concede that, for the roughly 50 days per year that agricultural workers are in the Albin vineyard, the portable toilet is a permissible agricultural use that is entitled to remain in its current location. Plaintiffs nevertheless argue that, for the balance of the year, the portable toilet is explicitly prohibited by Article VI, subsection 1(e)(1) of the original CCRs. We agree.

---

[20] Plaintiffs do not assert that the porta-potty is a nuisance either under the common law or the original CCRs.

because the association's members disapprove of billiards. Here, the keeping of pets, including exotic pets, in safe facilities is a permitted "residential use." *See* 176 Or App at 185-88. Consequently, so long as the structure for holding such pets does not violate some other (*e.g.*, design-related) requirement of the CCRs, the preapproval process cannot be employed as a subterfuge to preclude that permitted use. Such a denial is unreasonable and capricious.

We thus conclude that the trial court erred in entering judgment for defendants on their second counterclaim for an injunction compelling the removal of the cougars' holding facility and on their third counterclaim for an injunction compelling the removal of the cougars themselves from plaintiffs' property. We further, and concomitantly, hold that the trial court erred in entering judgment for defendants against plaintiffs' first claim for declaratory and injunctive relief and plaintiffs' second claim for breach of contract. We reverse those dispositions and remand for the trial court to consider the appropriate scope of relief on plaintiff's first and second claims for relief.

■ the remaining issues—whether the trial court erred in failing to require removal of the porta-potty during periods when it is not required for agricultural purposes. In so ruling, the trial court concluded that plaintiffs had failed to prove that the portable toilet was not agricultural and that, consequently, the toilet was a "agricultural use" permitted under Article VI, subsection 1(b) of the original CCRs. The trial court also rejected plaintiffs' argument that the toilet was a "shack" or a "temporary storage facility" that required Board preapproval.[20]

Plaintiffs concede that, for the roughly 50 days per year that agricultural workers are in the Albin vineyard, the portable toilet is a permissible agricultural use that is entitled to remain in its current location. Plaintiffs nevertheless argue that, for the balance of the year, the portable toilet is explicitly prohibited by Article VI, subsection 1(e)(1) of the original CCRs. We agree.

---

[20] Plaintiffs do not assert that the porta-potty is a nuisance either under the common law or the original CCRs.

Article VI, section 1 of the original CCRs states: "Property may be reasonably and normally used for agricultural farming * * *." Original CCRs, Art VI, sec 1(b). Such agricultural use, however, is not unfettered. Rather, subsection 1(e)(1) further limits the permitted uses of property:

> "*In addition to the foregoing*, each lot shall be used, held, and conveyed pursuant to the following restrictive covenants * * *:
>
> "(1)   No temporary house, and no temporary or permanent storage building, shack, church, mobile or trailer home or tent shall be erected or placed on any lot or common area."

Plaintiffs argue that that unqualified prohibition requires removal of the portable toilet when it is not necessary for agricultural purposes, because such a structure is either a "temporary storage building" or a "shack," and thus is explicitly prohibited.

The question is one of contract interpretation: Is a portable toilet a "temporary storage building" or a "shack" as precluded by Article VI, subsection 1(e)(1) of the original CCRs? *Yogman*, 325 Or at 361. We think the question is answered conclusively, and affirmatively, by the provision's text and context. In particular, nearly all of the prohibited structures in subsection 1(e)(1) with the exception of the church are potentially unsightly structures, which, if allowed to proliferate unchecked, could compromise both the visual appeal, and ultimately the value, of the surrounding properties. *See* Original CCRs, Art V, sec 2 (Board shall regulate use of land "in such a manner as to preserve and enhance lot values and farming and to maintain a harmonious relationship among structures and the natural vegetation and topography"). Given that context, it is apparent that portable toilets, as temporary storage facilities for human waste, are exactly the sort of structure that Article VI, subsection 1(e)(1) was designed to address.[21] Accordingly, the trial court erred in entering judgment for defendant Albin on plaintiffs' claim for

---

[21] Article VI, subsection 1(g) of the original CCRs allows the Association Board to grant exceptions to use restrictions "provided the Board can show good cause." However, there is no evidence that the Board granted such an exception to subsection 1(e)(1) here, and Albin does not contend otherwise.

violation of the CCRs and in failing to enter an injunction requiring the removal of the portable toilet from the Albin property for the period that it is not used for agricultural purposes.

Judgment for defendants on defendants' second and third counterclaims reversed; judgment for defendants on plaintiffs' first and second claims for relief, and for defendant Albin on plaintiffs' third claim for relief, reversed and remanded for further proceedings; otherwise affirmed.